# Richmond

GERALD M. KIRACOFE v. COMMONWEALTH OF VIRGINIA.

March 11, 1957.

Record No. 4636.

Present, All the Justices.

The opinion states the case.

Submitted on briefs.

*Harry Blatt*, on brief, for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General* and *R. D. McIlwaine, III, Assistant Attorney General*, on brief, for the Commonwealth.

SPRATLEY, J., delivered the opinion of the court.

On October 17, 1955, a grand jury of Rockingham County, Virginia, returned four indictments against Gerald M. Kiracofe, hereinafter referred to as the defendant. Two of the indictments charged him with the rape of Linda Warner, a female child, six years of age. Code of Virginia, 1950, § 18-54. One of these offenses was alleged to have occurred on or about August 5, 1955, and the other on August 20, 1955. Two of the indictments charged him with illegally seizing, taking, or secreting the same child from the person having lawful charge of such child. Code of Virginia, § 18-47. One of these offenses was charged to have been committed on or about August 5, 1955, and the other on August 20, 1955.

On October 19, 1955, defendant was arraigned upon the two indictments, which charged the offenses alleged to have been committed on or about August 5, 1955. He entered a plea of not guilty to each indictment.

On November 25, 1955, the deposition of Linda Warner was taken in the presence of the accused and his counsel, the Attorney for the Commonwealth, and the trial judge. Virginia Code, § 18-56.

The cases came on to be heard on December 5, 1955, and, by agreement of the Attorney for the Commonwealth, counsel for the accused, and the accused in person, and with the consent of the trial judge, were tried jointly by a jury. The jury found defendant guilty of each offense as charged in the indictments, and fixed his punishment at confinement in the penitentiary for a term of twenty-

three years upon the indictment for rape, and for a term of two years upon the other indictment.

The motion of the defendant to set aside each of the two verdicts was overruled. Due exceptions were taken. The defendant was thereupon sentenced to confinement in the penitentiary, in accordance with the two verdicts. The case is now before us upon a writ of error to the judgments of conviction entered pursuant to the verdicts.

Among the witnesses for the Commonwealth were the prosecutrix, Linda Warner, and her cousin, Mary Caroline Taylor, a female child, nine years of age.

The crucial question raised by the principal assignment of error is whether the above children were competent to testify as witnesses. In other assignments the defendant contends that the verdicts are contrary to the law and the evidence and excessive; and that the court erred in the admission and rejection of evidence.

Because of its importance we will first consider the question of competency of the two children as witnesses. In determining their competency, it is proper to here set out the relevant portions of the deposition of the prosecutrix at the preliminary examination by the trial court, and the testimony of her cousin on her *voir dire*.

The testimony of Linda Warner was as follows:

"By Mr. George D. Conrad:

\*　\*　\*　\*　\*　\*　\*

"Q. Do you go to Sunday School sometimes?
"A. Not very often.
"Q. You have been there?
"A. No.
"Q. Have you ever been to church?
"A. Yes, when I was over at my grandmother's.
"Q. Has your mother tried to teach you what was right and what was wrong?
"A. No.
"Q. She has tried to teach you to be a good girl?
"A. Yes, but I don't always listen.
"Q. Do you know the difference between telling the truth and telling a lie?
"A. (Nodded head).
"Q. Would you tell the truth if you promised to do it?

"A. I don't know.

"Q. If the judge, Mr. Haas, here, asked you to tell the truth and you promised to do it, would you tell the truth?

"A. I don't know.

"Q. Do you know it is bad to tell a lie?

"A. Yes.

"Q. You don't tell a lie if you promise to tell the truth, do you?

"A. Sometimes.

"Q. I mean that if I asked you to tell me the truth about what happened, are you going to tell us the truth?

"A. I didn't promise yet.

"Q. Will you tell the truth if you promise to do it?

"A. I might.

"Q. I want to be sure now. I don't want you to tell me stories. You wouldn't have any reason to make up anything would you?

"A. I don't know.

"Q. Your mother told you to tell the truth?

"A. (Nodded head).

"Q. You don't want to be a bad girl, do you?

"A. Sometimes I am a bad girl.

"Q. Don't you try to be a good girl?

"A. No.

"Q. You wouldn't tell me a lie about Jerry would you?

"A. No.

"Q. Are you going to tell us the truth about Jerry if we ask you?

"A. Yes.

"Q. You are not going to make up anything—you are going to tell exactly what happened?

"A. (Nodded head).

"Q. Do you know what happens to bad people when they lie? Where do they go?

"A. Downstairs.

"Q. Where do the good people who tell the truth go?

"A. Upstairs."

"By Mr. Harry Blatt:

"Q. Linda, when you said you were going to tell the truth about Jerry, are you going to tell the truth about something else if you are asked?

"A. I don't know."

\* \* \* \* \* \* \*

"By the Court:

\* \* \* \* \* \* \*

"Q. What is your feeling, your own feeling, about people who tell an untruth as compared to people who always tell things that are true? Do you have any feeling about people who are inclined to tell something that is untrue most of the time?

"A. I don't like that.

"Q. You know that it is wrong?

"A. Sometimes my cousin lies to me.

"Q. And you don't like it?

"A. No, sir.

"Q. Do you know what it means to solemnly promise that you will be truthful?

"A. (Nodded head).

"Q. Do you know what might be the result if you promised or swore to somebody that you would tell the truth and then told an untruth?

"A. That would have been a bad way to do."

"The Court:

"I think I will let the child go ahead and testify.

"The Court:

"Let me ask you this Linda. When you said a minute ago to Mr. Conrad that you didn't know whether you would or would not tell the truth, what did you mean by that?

"A. I don't know whether I would tell the truth or not.

"Q. Would you purposely tell a lie, or make a mistake?

"A. That's right.

"Q. Which is right? That you might purposely tell a lie?

"A. Huh uh.

"Q. Or that you might make a mistake?

"A. (Nodded head).

"Q. I want to be perfectly sure what you mean. Do you mean that you would not purposely tell a lie?

"A. No.

"Q. Of course anybody can make a mistake. For instance if you ask me what time it is and I would say '11:00 o'clock' and I would be wrong, but that wouldn't be a lie because I thought it was 11:00 o'clock. That is just a mistake. Did you mean that kind of mistake

or a deliberate mistake on purpose? That is, would it be a deliberate mistake or accidental?

"A. Accidental."

"The Court:

·"The Court will accept her as competent."

"Mr. Blatt:

"The accused objects and excepts to the ruling of the court."

"The Court:

"Now Linda, this is a Holy Bible, and I want you to put your hand on it and the Court will ask you do you promise that every answer that you give to the questions that are asked will be truthful as far as you can say?

"A. I do."

The testimony of Mary Caroline Taylor was, in part, as follows:

"By Judge Haas:

"Q. How old are you?

"A. 9.

"Q. Do you go to school?

"A. Yes.

"Q. How far are you in school?

"A. The third grade.

"Q. Have you learned the difference between a lie and the truth?

"A. (Shakes head no).

"Q. You mean you don't know the difference between a lie and truth?

"A. (Shakes head no).

"Q. Do you know what it means to take an oath to promise to tell the truth, the whole truth?

"A. (Shakes head no).

"Q. Do you go to any kind of church or Sunday School?

"A. I used to go to the Mennonite.

"Q. Where is that?

"A. I used to go to Red Hill.

"Q. ·Have you been told the difference between things that are right and things that are wrong?

"A. (Shakes head no).

"Q. Is it right to tell a lie?

"A. No.

"Q. Why isn't it right?

"A. It gets you in trouble.

"Q. Do you understand that when a person who testifies as a witness in the trial of the case that that person is required to take an oath to promise that she or he will tell the truth, the whole truth?

"A. Yes.

"Q. Do you know why that is done?

"A. (Shakes head no).

"Q. Would it be right or would it be wrong or would it make any difference if somebody promises to tell the truth and then told something that is not true?

"A. (Shakes head no)."

"By Mr. Conrad:

"Q. Tootsie you are not scared, are you?

"A. Yes.

"Q. Now I don't want you to be scared. If you promise to tell the truth, are you going to stick to that promise?

"A. Yes.

"Q. You are going to tell the truth?

"A. Yes.

"Q. Do you know it is bad not to tell the truth?

"A. Yes.

"Q. Do you know what happens to them?

"A. Yes.

"Q. What happens to them?

"A. The devil burns them.

"Q. You don't want that to happen to you, do you?

"A. No.

"Q. You promise to tell the truth?

"A. Yes."

"By Mr. Blatt:

"Q. Tootsie, if you tell a lie what happens to you?

"A. Well the devil scolds you.

"Q. The devil will scold you?

"A. Yes."

The principles to be applied in determining the competency of a child to testify as a witness have been established in Virginia in numerous decisions of this Court. They are clearly stated at length in *Rogers* v. *Com.*, 132 Va. 771, 111 S. E. 231, where a little girl nearly six and her brother eight years old were involved, and restated recently in *Cross* v. *Com.*, 195 Va. 62, 77 S. E. 2d 447, where a six-year old child was involved.

We have repeatedly said that there is no fixed age at which a child must have arrived to be competent to testify, for competency depends not on age, but on intelligence, a sense of moral responsibility, and the mental capacity to observe events about which the testimony is offered, to remember them, to understand questions propounded, and the ability to make intelligent answers, all with regard to truth. The whole question of competency must be largely left to the discretion of the trial court, because of the opportunity of the trial judge to see the child and observe its demeanor on the stand. The decision of the trial court will not be disturbed except for manifest error. *Rogers* v. *Com., supra; Davis* v. *Com.,* 161 Va. 1037, 171 S. E. 598 (child eight years of age); *Mullins* v. *Com.,* 174 Va. 472, 474, 5 S. E. 2d 499 (child 4½ years of age); *Carpenter* v. *Com.,* 186 Va. 851, 44 S. E. 2d 419 (child seven years of age); *Hepler* v. *Hepler,* 195 Va. 611, 619, 79 S. E. 2d 652 (child twelve years of age); 20 M. J., Witnesses, § 9, page 423; Wigmore on Evidence, 3d Ed., Infancy, § 507, page 597.

The foregoing principles were concisely stated and approved in *Cross* v. *Com., supra,* 195 Va. at page 64, where the Court said:

"There is no specific age at which a child must have arrived in order to be competent as a witness. A child is competent to testify if it possesses the capacity to observe events, to recollect and communicate them, and has the ability to understand questions and to frame and make intelligent answers, with a consciousness of the duty to speak the truth. Wigmore on Evidence, 3d ed., Infancy, sec. 506, p. 596; 5 Jones Commentaries on Evidence, 2d Ed. Competency of Witnesses, sec. 2106, p. 3953; 70 C. J., Witnesses, secs. 121, 122, pp. 91-94. The question of the competency of a child as a witness, to a great extent, rests in the sound discretion of the trial court, whose decision will not be disturbed unless the error is manifest." (Cases and authorities cited).

The evidence on behalf of the Commonwealth in this case shows that, in the late afternoon or early evening, on or about August 5, 1955, Linda Warner was playing with her cousin, Mary Caroline Taylor, and two boys, Roby and Richard Hedrick, in the vicinity of Noll Drive, in Harrisonburg, Virginia. Linda was then in charge of her aunt, Mrs. Cam Taylor, who is a sister of Linda's mother, Wilda Warner, the latter being at that time engaged in her work as a waitress in a restaurant. Linda, six years of age, and a first grade pupil in school, was playing with her cousin and the two Hedrick boys, when the defendant drove up, stopped his automobile, and

asked Linda to get into his car, saying that he would drive her around the block. Linda accepted his invitation.

Linda testified that the defendant drove her to an area, known as Waterman Woods, on Highway Route 33, which is located one-half to three-fourths of a mile from Noll Drive; that she and the defendant got out of the car and went into the woods; that defendant then removed her undergarments, unbuttoned his trousers; and that she laid on the ground and he laid on her. The details of what then happened are not fit to be printed. It is sufficient to say that as recited by the child, they show that defendant had carnal knowledge of her. He then drove her back to Noll Drive, where she told her cousin and Roby Hedrick what had occurred.

Later, on August 20, 1955, Linda said she and her cousin were in a business place, referred to as the "beer place," when the defendant asked them to go with him across the street to an area, to a place called the "bag place." Mary Caroline Taylor declined to go. Linda followed the defendant to the designated area, where she said the defendant again had sexual intercourse with her.

Mary Caroline Taylor is nine years of age, and has reached the third grade in school. She corroborated the statement of her cousin that on the first afternoon in question, the defendant asked Linda to get in his car, Linda complied, the defendant drove away, and that when Linda returned she told her, Mary Caroline, that defendant had taken her to the area known as Waterman Woods. Mary Caroline also said that she heard the defendant, on the second occasion, ask Linda to go with him to the "bag place," and that Linda followed him; but that she, Mary Caroline, did not go with him, and she did not see Linda again that night.

Richard Hedrick, fifteen years of age, and an eighth grade student, said that he was playing with his cousin, Roby Hedrick, and with Linda and Mary Caroline on the afternoon first in question. He said that a car drove up, and that a man, who looked like the defendant, called Linda over to the car, that Linda got in the car, and that she and the man drove off. He did not see Linda any more that day.

Roby Hedrick, eight years of age, referring to the same occasion, said that Linda got into the automobile with the defendant, and that the defendant then drove off. He said that when Linda returned, she said she had been to Waterman Woods; but he would not let her finish her story as to what occurred in the woods, telling her

he did not wish to hear about it. He further said that he knew the defendant before the day in question, and was sure that he was the man who came and got Linda on that day.

With further respect to the identification of the defendant, Emily Trainer and her sister, Eleanor Trainer, said that they saw the defendant come out of a restaurant and talk to Linda and Mary Caroline on or about August 20, 1955; that they saw Linda come out of an alley and the defendant following Linda.

Mrs. Cam Taylor, the aunt of the prosecutrix, testified that during the summer of 1955, she kept the child in her charge for the latter's mother; that she had never given the defendant permission to take the child in his car, or to talk to her. Linda began complaining to her on August 8, 1955, and she then noticed that when Linda went to the bathroom she carried "two pairs of panties with her," and was having trouble with a vaginal discharge.

Wilda Warner, the mother of Linda, said she had lawful custody of the latter, that she left her child with her sister, Mrs. Taylor, while she, Wilda, was working; that she first heard on August 20, 1955, that the defendant had taken the chi'd out; that Linda had been complaining of soreness in the area of her genital organs a week before that; that she observed that she was having a vaginal discharge, and she took the child to Dr. Charles C. Powell on August 22, 1955.

Dr. Charles C. Powell testified that he examined Linda, and found "a thick discharge, the vagina red, there being considerable discharge and a lot of pus." There was such a swelling that he could not say whether there was any laceration or wounding, and it was one of the worse cases he had seen in an adult or child. He said he had a slide prepared from the discharge mailed to and examined at the State Laboratory in Luray.

George R. Jones, a bacteriologist and the Director of the State Regional Laboratory at Luray, in describing the procedure at the laboratory upon the receipt of slides, said that when they are received they are unwrapped by a Mrs. Benson, one at a time, and a daily work number assigned to, and put on them as they are unwrapped; that the slide bearing the name of Linda Warner was received through the mail, and given the Number 3; that it was then taken to the microscope by Mrs. Benson, and thence to a typist, Mrs. Campbell, who gave it the serial number 1276; that he personally examined the slide bearing the name of Linda Warner; and that his examination disclosed the presence of gonococci.

Dr. Hollen G. Helbert testified that, on August 22, 1955, he examined defendant for venereal disease, and found that he had gonorrhea.

The defendant testified that he did not molest the prosecutrix on August 5, 1955, or at any other time. He declared that he was, at the alleged time of the commission of each of the acts charged, elsewhere than at the alleged place of commission. Several witnesses, including his wife, testified in support of his alibi.

In the case before us, the two female infant witnesses, in strange surroundings, were subjected to many questions, a situation which sometimes proves confusing to adults. The answers of each of them, on their examinations as to their competency to testify, and as to the merits of the case, show that each had mental capacity, intelligence, and a sense of moral responsibility to speak the truth quite above the average of children of their respective ages. Their answers were clear, direct, and definite, without confusion or evasion.

The case was heard by an able and experienced trial judge, who saw the witnesses face to face and heard all of the statements of the prosecutrix and her cousin. He had the opportunity of judging, from their demeanor on the stand and their answers, the degree of their intelligence, their mental capacity to understand the questions asked them, their ability to remember and recite the happenings in question, and their sense of moral responsibility to tell the truth; and there is nothing in the record to indicate that he erred in permitting their testimony to be considered by the jury.

The defendant contends that the court erred in refusing to permit him to ask Richard Hedrick "whether he had ever been adjudged a juvenile delinquent in a proceeding in a juvenile court involving a felonious offense or one involving larceny." Although no ground was given for his exception to such refusal in the trial court, he now contends that such an adjudication should have been allowed to affect the credit to be given the witness. Code, § 19-239. In answer, the Attorney General relies upon the provisions of Chapter 8, Code of Virginia, 1950, entitled, "Juvenile and Domestic Relations Courts." Sections 16.1-139—16.1-178, 1956 Cum. Supp.; Acts of Assembly, 1950, Chapter 383, pages 665 et seq., as amended. He points out that in furtherance of the purpose of the Act, provision is made for the keeping of separate dockets of cases arising thereunder, for the conduct of juvenile hearings at a different time from the hearing of other cases, for the exclusion of the general public from

all such hearings and the withholding of the records from public inspection, Code, §§ 16.1-162 and 16.1-163; and that juveniles are not adjudicated "guilty" but merely as being "within the purview" of the statute, § 16.1-178.

Code, § 16.1-179 expressly provides:

"Except as otherwise provided, no adjudication or judgment upon the status of any child under the provisions of this law shall operate to impose any of the disabilities ordinarily imposed by conviction for a crime, nor shall any such child be denominated a criminal by reason of any such adjudication, nor shall such adjudication be denominated a conviction.

"The disposition made of a child or minor or any evidence given in court concerning him shall not operate to disqualify the child in any future civil service application or appointment or military or naval enlistment."

Statutes of the character above originated in a policy not to permit the same uses to be made of records of juvenile courts as are frequently made of criminal records of courts of general jurisdiction, for the reason that juvenile proceedings are corrective in nature rather than penal. The child is looked upon not as a bad man, who should be punished but as an erring child who needs help. The primary function of the juvenile courts properly considered is not conviction or punishment for crime; but crime prevention and juvenile rehabilitation. Code, § 16.1-179, as will be noted, expressly forbids that any adjudication thereunder shall be denominated a conviction. The courts are not in agreement that under such statutes questions propounded a witness calculated to establish a conviction, or other substantive fact brought out before a juvenile court, are not allowable. Some exclude statements upon matters showing the substance of juvenile proceedings; while others allow an examination referring to such proceedings but not disclosing their substance. Annotation 147 A. L. R. page 443, *et seq.*

In the case of *Thomas* v. *United States*, 74 App. D. C. 167, 121 F. 2d 905, the question here presented was considered and determined, and the court held that the complaining witness in a prosecution of a defendant for being the father of an illegitimate child, could not be cross-examined relative to her alleged arrest and trial for larceny, in a juvenile court, under a statute forbidding the use of such matter against the child "in any case or proceeding in any other court." In *People* v. *Smallwood*, 306 Mich. 49, 10 N. W. 2d 303, 147 A. L. R.

439, the court took a somewhat more restricted view of the scope and effect of the privilege accorded by such statute, holding that while the juvenile records are not admissible, questions which do not refer to the "disposition of the child," but merely as to whether he or she had been in trouble with the juvenile authorities are admissible as bearing upon credibility.

The question in the instant case, as framed, was not admissible. It referred to an adjudication in a juvenile court, that is, to the disposition of the child. It required a "yes" or "no" answer, and any follow-up of an inquiry into the records of the juvenile court would have been required to be excluded. Cf. *Malone* v. *State*, 130 O. S. 443, 200 N. E. 473; *State* v. *Kelly*, 169 La. 753, 126 So. 49; *State* v. *Guerrero*, 58 Ariz. 421, 120 P. 2d 798.

In view of the provisions of our statutes, the court did not err in refusing to allow the defendant to ask the question above stated.

■ Defendant next contends that the court erred in refusing to allow him, after the Commonwealth had shown that he had been convicted of giving a bad check, to state whether or not his conviction was based upon conflicting evidence. The trial court, at the conclusion of the evidence, told the jury that although it had sustained the objection of the Commonwealth to defendant showing that his bad check conviction was on conflicting evidence, it had come to the later and changed view that such showing was properly admissible. The court then told the jury that they might consider, as a conceded fact, that such conviction of the defendant was on conflicting testimony; but that the defendant had, nevertheless, been found guilty of the charge.

Defendant relies upon *Smith* v. *Com.*, 161 Va. 1112, 172 S. E. 286. In that case, the accused was allowed to show that his former conviction had been obtained by the admitted perjury of the plaintiff witness for the prosecution, who had subsequently settled a civil action against him by the accused, paying to the accused $1,000. There the court said:

"To remove that stain, or to weaken its weight, the accused has a right to show the nature of the charge, the mere fact, if it was a fact, that he was convicted on conflicting evidence, and that he had served his time or had been paroled or pardoned by the Governor." 161 Va. page 1117.

The authorities are not agreed to what extent a witness may go in seeking to explain his prior conviction of a criminal offense. Anno-

tation 166 A. L. R., page 211, *et seq.* A majority of the courts allow a reasonably brief protestation in behalf of the accused in the extenuation of his guilt, or in the assertion of his innocence of the charges, the extent usually resting in the discretion of the trial judge.

. In Virginia, an accused has a right to testify that he was convicted on conflicting evidence; but not to state the whole circumstances of such prior conviction, except under peculiar circumstances. *Smith v. Com., supra,* at page 1117. A rehearing of the whole evidence in a former case would present a confusion of issues, and lead to unlimited possibilities. *Coffey v. Com.,* 188 Va. 629, 51 S. E. 2d 215.

In this case, the court's statement was sufficient to correct its initial ruling, and there was no error harmful to the defendant.

Finally, defendant contends that the specimen slide examined by the State Laboratory at Luray, Virginia, was not sufficiently identified as the slide prepared from the vaginal discharge of the prosecutrix and mailed by Dr. Powell to the laboratory. In support of his contention, he relies upon *Rodgers v. Com.,* 197 Va. 527, 90 S. E. 2d 257. The facts in that case are different from those here. There, the testimony of the technician, who withdrew a sample of the defendant's blood, was conflicting and confused as to her handling and disposition of the sample. She said she put the blood into two tubes, one plain and one containing potassium oxalate. She did not remember whether the trooper, who accompanied the defendant, furnished her with a tube, nor whether she labeled the tubes, or by whom they were mailed, or to whom. A toxicologist in Richmond, Virginia, who made the blood analysis in that case merely identified a sample of blood received by him as bearing the defendant's name; but he did not give any details as to its receipt or handling in his office.

In the case now before us, it was shown that a slide was prepared, properly labeled, and mailed to a definite laboratory. Bearing that label, it was duly received and upon its receipt the details of its subsequent handling, numbering, and examination were specifically stated. In the absence of any evidence tending to impugn the identity of the slide taken by Dr. Powell, we think that it was sufficiently identified.

The evidence presented amply supports the conclusion of the jury that the defendant had carnal knowledge of the prosecutrix. The consent of the infant prosecutrix in this case was immaterial. Moreover, the evidence of the Commonwealth is sufficient to prove that

defendant unlawfully seized, took and secreted the prosecutrix from the person having lawful custody of her without the consent of such person. The sordid and depraved nature of the offenses was such as to merit the condemnation of all decent people, and the punishment was within the range prescribed by the statute.

We find no merit in any of the remaining assignments of error. The evidence as stated, and the law applicable thereto, compel an affirmance of the judgment of the trial court.

*Affirmed.*