JERRY WAYNE HOPKINS

V.

COMMONWEALTH OF VIRGINIA

Record No. 840660

JERRY WAYNE HOPKINS

V.

COMMONWEALTH OF VIRGINIA

Record No. 840745

November 27, 1985

Present: All the Justices

*B. James Jefferson; David A. Melesco (Welch & Jefferson,* on brief), for appellant. (Record No. 840660).

*Russell C. Williams, Assistant Attorney General (William G. Broaddus, Attorney General,* on brief), for appellee. (Record No. 840660).

*Ward L. Armstrong; R. Morgan Armstrong (Armstrong & Armstrong,* on brief), for appellant. (Record No. 840745).

*John H. McLees, Jr., Assistant Attorney General (William G. Broaddus, Attorney General*, on brief), for appellee. (Record No. 840745).

COCHRAN, J., delivered the opinion of the Court.

In these appeals, Jerry Wayne Hopkins challenges his conviction in Franklin County of the murder of Rose Marie Kretschman and his conviction in the City of Martinsville of abduction of Kretschman. The convictions arose from a common factual background.

Hopkins was tried in Martinsville under indictments charging him with abducting Kretschman and maliciously wounding Tyrone Griffin on May 1, 1983. In January 1984, a jury found Hopkins guilty of Kretschman's abduction, fixing his punishment at confinement in the penitentiary for 10 years, but found him not guilty of unlawfully wounding Griffin. On January 19, 1984, the trial court sentenced Hopkins in accordance with the verdict. We granted Hopkins an appeal limited to consideration of the sufficiency of the evidence and questions concerning the testimony of a witness who had been exposed to hypnosis prior to trial.

In February 1984, Hopkins, tried by a jury in Franklin County under an indictment charging him with Kretschman's murder on or about May 1, 1983, was found guilty of first-degree murder; his punishment was fixed at life imprisonment. The trial court entered judgment on the verdict on February 6, 1984. We granted Hopkins an appeal limited to the question whether the trial court erred in admitting certain evidence identifying Kretschman as the murder victim.

Tyrone Griffin's testimony was essentially the same in both trials. He and Kretschman, his girlfriend, left his grandmother's house on foot on Sunday, May 1, to go fishing at Lester Lake in a remote area in Martinsville. They carried with them a backpack, a tackle box, two bottles of soft drinks, six or eight empty drink bottles, two rods and reels, a bucket of live bait, and sandwiches for their lunch. On the way, Griffin found a tire weight which he put in the backpack. At the lake, as Griffin and Kretschman ate their sandwiches, Hopkins, whom Griffin had never seen before, approached and conversed with them. Hopkins talked with them several times; once he asked Griffin about the possibility of buying drugs. Hopkins brought Kretschman a soft drink and gave Griffin

a drink of corn liquor. Hopkins fished with them in the late afternoon until dark, when he offered them a ride home. Griffin and Kretschman accepted his offer, walked with him to his car parked nearby at the Elvis McBride house, and placed their gear in the back seat of the car. Initially, Kretschman sat in the back seat while Hopkins and Griffin occupied the front seat.

Hopkins drove the car a short distance up Bethel Lane but soon stopped, held a knife to Griffin's neck, and began to back the car down the road. Griffin "jerked the knife away from [his] neck" and struggled with Hopkins. In testifying about the alleged wounding, Griffin said he did not realize until a few minutes later that he had been cut. After Griffin "calmed down," Hopkins ordered Kretschman to get into the front seat. She did so, and Hopkins drove to a nearby dirt road which turned off to the right. Stopping on this roadway, Hopkins ordered Griffin and Kretschman out of the car. He searched them, then began looking in the car for a roll of tape. Griffin and Kretschman ran, but Hopkins caught Kretschman by her hair. He told Griffin, "If you don't come back, I'm going to kill her." When Griffin returned, Hopkins taped his hands together. Hopkins then went back to the car, opened the trunk, pointed to a shovel, and threatened to kill Griffin and bury him with the shovel if he caused any more trouble. Freeing his hands, Griffin again grabbed Kretschman and ran. Hopkins caught Kretschman as before, but this time Griffin continued to run. He called the police from a nearby house.

Hopkins, who did not testify in the murder trial, gave an account in the abduction trial of the events at the lake that was substantially the same as Griffin's, but he denied drinking liquor or offering any to Griffin that afternoon. According to Hopkins, he offered the two a ride into town, and they went with him to his car. He placed his fishing equipment in the trunk, where he had a shovel, and they put their gear in the back seat. All three then sat in the front seat. Hopkins said he let Griffin and Kretschman out at a shopping center, ate at a nearby restaurant, and proceeded to Danville to a movie. Returning to Martinsville about 12:30 a.m., he slept in his car in the parking lot of Regent Industries, where he worked.

On June 14, 1983, the remains of a human body were found in Franklin County on property formerly belonging to Hopkins's grandfather and still in his family. In the murder trial, Dr. David W. Oxley, chief medical examiner for western Virginia, testified

that the remains were those of Kretschman. He based his testimony on an identification made by Dr. A. W. Kagey and summarized in the autopsy report. Kagey, a Roanoke dentist, identified the remains by comparing the teeth with Kretschman's dental records provided by her dentist.

Elvis McBride testified that she had permitted Hopkins to park his car in the driveway at her house for two weeks. He slept in the car. When she and her family returned home from church about 9:00 p.m. on Sunday, May 1, Hopkins's car was there but she did not see Hopkins. Soon thereafter, while she was inside the house, she heard the car start and drive away.

George Preston Carter testified that Griffin telephoned the police Sunday night, May 1, from Carter's house on Williams Street near Bethel Lane. In the abduction trial, Carter estimated that Griffin made the call between 9:00 and 9:30 p.m.; in the murder trial he estimated a slightly later time. The police received the call at 9:20 and found Griffin near the scene when they arrived minutes later.

Police officers talked to Hopkins early Monday morning, May 2, at Regent Industries. They then went to the scene of the alleged abduction, where they saw a man dressed like Hopkins running through the woods. One of the officers positively identified the man as Hopkins. Co-workers said Hopkins had borrowed a car and left work that morning immediately after the police had talked to him. Hopkins was arrested at work later that day.

Witnesses said Hopkins was wearing blue shorts, a striped shirt, and high-top tennis shoes on May 1. They said he always carried a knife on his belt and another in his car. In the abduction trial, Hopkins denied wearing the clothes described, saying he had on green cut-off shorts and low-top tennis shoes.

Officers searched Hopkins's car following his arrest on May 2. In the trunk they found a tire weight, a shovel, a tackle box, and a rod and reel. From the interior they recovered a bottle of grain alcohol which was almost empty, Price Breaker cigarettes, articles of clothing, the contents of the ash tray, and hair and debris vacuumed from the car.

At the site where the body was found, investigators discovered a cigarette filter, four matches, empty drink bottles, a backpack, two fishing rods, tennis shoes, and clothing. A roll of tape found about 100 feet from the body was determined to be a kind of tape with limited distribution to local industries, one of which was lo-

cated in the building where Hopkins worked. The tape was identical to tape previously seen in Hopkins's possession.

Laboratory analysis showed that the cigarette filter found near the victim's remains was a kind of filter found in Price Breaker cigarettes, in 13% of all cigarettes sold, and in 4% of all cigarette brands. Examinations of hair samples revealed that head hairs consistent with Hopkins's hair were on clothing found with the remains. Furthermore, samples of pubic hair taken from a portion of a woman's panty found with the remains were consistent with a hair swept from Hopkins's car and a hair removed from a jacket found in the car. No hairs similar to samples taken from Griffin were found either in the car or with the victim's remains.

Hopkins testified in the abduction trial that he drove Griffin and Kretschman to town and let them out near a group of stores. Two employees of the drugstore at that location testified in both trials that Griffin was in the store that Sunday between 6:30 and 7:30 p.m. Griffin denied being there at that time. Another defense witness testified that Griffin told her Hopkins left him and Kretschman at the drugstore about 8:15 p.m. on that date. In the abduction trial, a defense witness testified to having heard Griffin say he had taken Kretschman to the property belonging to Hopkins's grandparents two days after she disappeared.

## I. The Murder Trial—Record No. 840660.

█ In the trial of the murder charge, Hopkins objected to admission of Kagey's dental identification evidence through the medical examiner's testimony or the autopsy report.[1] The trial court ruled that the identification was admissible under Code § 19.2-188.[2] Expressions of opinion, however, are not admissible merely because they are included in a medical examiner's report; only

---

[1] In the trial of the abduction charge, the parties stipulated that the remains were Kretschman's.

[2] *Code § 19.2-188. Reports and records received as evidence.* — Reports of investigations made by the Chief Medical Examiner or his assistants or by medical examiners, and the records and reports of autopsies made under the authority of Title 32.1 of this Code, shall be received as evidence in any court or other proceeding, and copies of records, photographs, laboratory findings and records in the office of the Chief Medical Examiner or any medical examiner, when duly attested by the Chief Medical Examiner or one of his Assistant Chief Medical Examiners, or the medical examiner in whose office the same are, shall be received as evidence in any court or other proceeding for any purpose for which the original could be received without proof of the official character or the person whose name is signed thereto.

statements of fact are admissible under this statutory exception to the rule excluding hearsay evidence. *Bond v. Commonwealth*, 226 Va. 534, 537, 311 S.E.2d 769, 771 (1984); *Ward v. Commonwealth*, 216 Va. 177, 178, 217 S.E.2d 810, 811 (1975). The trial court erred, therefore, in admitting the evidence of Kagey's identification of the remains. We agree with the Commonwealth, however, that the error in admitting this evidence was harmless.

■ The identity of the remains was not contested at trial. Hopkins defended himself on the theory that he did not kill Kretschman. He never asserted that she was not the victim whose remains were found in Franklin County. He merely contended that he was not the killer. *See Fitzgerald v. Commonwealth*, 223 Va. 615, 630-31, 292 S.E.2d 798, 807 (1982), *cert. denied*, 459 U.S. 1228 (1983). Although it was the burden of the Commonwealth to prove every essential element of the case, including the identity of the victim, circumstantial evidence in the record establishes the identity of the remains.

Oxley testified that the body was that of a Caucasian female, measuring five feet to five feet four inches in height and weighing between 110 and 120 pounds. This conclusion was based on his own examination of the remains. Among the items found with the remains were two empty soft drink bottles, a backpack, two buckets, a fish stringer, a Zebco rod and reel, and a Penguin rod and reel. Griffin identified the backpack, stringer, buckets, and rods and reels as those he and Kretschman had used on May 1 and ultimately had placed in Hopkins's car. Griffin said the buckets had contained fish they had caught. Among the human remains were found "two vertebral bodies . . . animal in origin."

Kretschman was last seen alive in Martinsville in the company of Hopkins. The victim's remains were found on land formerly owned by Hopkins's grandfather and known to Hopkins. Comparison of hair samples showed that hairs taken from the victim's head and from the woman's panty found with the remains were consistent with head and pubic hairs found in Hopkins's car on May 2.

The only reasonable conclusion the jury could reach from the evidence, exclusive of Kagey's identification, was that the remains were those of Kretschman. Error in the admission of the identification evidence, therefore, was harmless beyond a reasonable doubt. *Simpson v. Commonwealth*, 227 Va. 557, 565, 318 S.E.2d 386, 391 (1984); *Rozier v. Commonwealth*, 219 Va. 525, 528, 248

S.E.2d 789, 791 (1978); *Jones* v. *Commonwealth*, 218 Va. 732, 737, 240 S.E.2d 526, 529-30 (1978); *see* Code § 8.01-678 (no reversal for trial error where it plainly appears from the record and the evidence that the parties received a fair trial on the merits and that substantial justice was reached); *see also Chapman* v. *California*, 386 U.S. 18, 24 (1967) (federal constitutional error, to be harmless, must be harmless beyond a reasonable doubt). Accordingly, we will affirm Hopkins's conviction of murder.

## II. The Abduction Trial—Record No. 840745.

Hopkins filed a pretrial motion to exclude in its entirety the testimony of Tyrone Griffin because hypnosis was used to refresh or attempt to refresh his memory. At the hearing on the motion the facts were established by uncontradicted evidence.

In the second week following Kretschman's disappearance, her body had not yet been discovered. Either at Griffin's or the police's suggestion, Griffin attempted to undergo hypnosis in an effort to remember more details of the events of May 1. On May 13, two members of the Martinsville Police Department escorted Griffin to the home of Dr. Mervyn R. King, an anesthesiologist who frequently used hypnosis in his medical practice.

Griffin, King, and Detective Ronald L. Hatcher were present during the attempted hypnosis. Hatcher did not speak or participate in the session, but Griffin could see him. King spoke for several minutes with Griffin, obtaining his "general history and background." King was familiar with the case through newspaper articles and conversations with police officers.

King attempted to hypnotize Griffin by counting backwards and suggesting at intervals that Griffin was going "deeper and deeper" into a hypnotic trance. King then asked Griffin to recount the events leading up to the alleged abduction. He prompted Griffin to give a more detailed account by intervening with questions as Griffin narrated the day's events. King and Hatcher insisted that King's questions were not suggestive. Griffin recalled the events through the time he called the police, after which King "woke him up." King did not record or make any written notes of the session.

King and Griffin both asserted that the attempt to hypnotize Griffin was unsuccessful. Both testified that Griffin's account of the events was not altered or enhanced. King believed Griffin was no more than 1% hypnotized.

Dr. Winfred O. Ward, a defense witness who was qualified as an expert in forensic hypnosis, testified that he believed Griffin was in a hypnotic state during this session. Because King failed to administer certain standard tests which Ward described, Ward believed it was impossible to determine the level of hypnosis achieved.

The trial court ruled that any information obtained from Griffin by using hypnosis would be inadmissible. However, after reviewing testimony summarizing the content of Griffin's oral statements to the police prior to hypnosis, police notes taken during his statements, copies of his written statements, and transcripts of interviews, the court found that Griffin did not testify to anything he had not told the police before the attempted hypnosis. Accordingly, the court denied the motion to exclude Griffin's testimony.

At the conclusion of Griffin's testimony at trial, Hopkins's counsel moved to strike the testimony on the ground that it was tainted by hypnosis. The court, finding that Griffin again had not testified to anything he had not told the police before the attempted hypnosis, and ruling that whether Griffin had been hypnotized remained an issue, denied the motion. The court ruled, however, that Hopkins could present expert testimony to show that a person who undergoes hypnosis may become more positive as a witness and prevent effective cross-examination. Ward, the expert witness called by the defense, so testified. He also testified to the guidelines that, in his opinion, should be followed in conducting a hypnotic session.

At the conclusion of the evidence, the trial court, over objection, refused four instructions proffered by Hopkins relating to the attempted hypnosis of Griffin and gave its own instruction. The credibility instruction permitted the jury to consider the fact that a witness was questioned under hypnosis and the circumstances under which the hypnotic session was conducted in assessing the witness's confidence and manner in presenting testimony. Hopkins contends that this instruction was insufficient and that the court erred in refusing the instructions which he tendered. We disagree.

Heretofore, we have considered only one narrow question concerning the admissibility of hypnotic evidence. In *Greenfield* v. *Commonwealth*, 214 Va. 710, 715-16, 204 S.E.2d 414, 419 (1974), we recognized the unreliability of evidence resulting from hypnosis because one under hypnosis may manufacture false facts and may be susceptible to suggestion. Accordingly, we held that

hypnotic evidence, whether testimony given in court by a witness under hypnosis or an account of what a person said while under hypnosis, is inadmissible. *Id.* at 716, 204 S.E.2d at 419. We noted, however, that an entirely different question is raised where the witness's memory has been restored or induced by prior hypnosis, and we did not address the question of admissibility of testimony based on such recollection. *Id.*, 204 S.E.2d at 419.

Some courts have adopted a *per se* rule of inadmissibility of hypnotically enhanced memory.[3] In most states, however, this rule of exclusion does not bar admission of matters recalled and related prior to hypnosis.[4]

Courts in some states allow admission of post-hypnotic testimony where the hypnosis session is conducted in compliance with specified procedural safeguards, such as requiring that the hypnotist be qualified and neutral and that prior statements and the hypnosis session be recorded, to insure that hypnotically refreshed recollection is free from suggestion.[5] Even absent such safeguards,

---

[3] *See, e.g., State v. Mena,* 128 Ariz. 226, 231, 624 P.2d 1274, 1279-80 (1981); *People v. Shirley,* 31 Cal. 3d 18, 66-67, 641 P.2d 775, 804, 181 Cal. Rptr. 243, 272-73, *cert. denied,* 459 U.S. 860 (1982); *State v. Haislip,* 237 Kan. 461, 482, 701 P.2d 909, 925-26 (1985); *State v. Collins,* 296 Md. 670, 702-03, 464 A.2d 1028, 1044 (1983); *Commonwealth v. Kater,* 388 Mass. 519, 527, 447 N.E.2d 1190, 1196 (1983); *People v. Gonzales,* 415 Mich. 615, 626, 329 N.W.2d 743, 748 (1982); *State v. Mack,* 292 N.W.2d 764, 771 (Minn. 1980); *State v. Palmer,* 210 Neb. 206, 218, 313 N.W.2d 648, 655 (1981); *People v. Hughes,* 59 N.Y.2d 523, 545, 453 N.E.2d 484, 495, 466 N.Y.S.2d 255, 266 (1983); *State v. Peoples,* 311 N.C. 515, 531-32, 319 S.E.2d 177, 187 (1984); *Commonwealth v. Nazarovitch,* 496 Pa. 97, 111, 436 A.2d 170, 178 (1981).

[4] *See, e.g., State ex rel. Collins v. Superior Court, etc.,* 132 Ariz. 180, 209-10, 644 P.2d 1266, 1295 (1982) (supplemental opinion); *Haislip,* 237 Kan. at 482, 701 P.2d at 926; *Collins,* 296 Md. at 702, 464 A.2d at 1044; *Kater,* 388 Mass. at 529, 447 N.E.2d at 1197; *People v. Nixon,* 421 Mich. 79, 90, 364 N.W.2d 593, 599 (1984); *State v. Ture,* 353 N.W.2d 502, 514 and n.7 (Minn. 1984); *State v. Patterson,* 213 Neb. 686, 692, 331 N.W.2d 500, 504 (1983); *Hughes,* 59 N.Y.2d at 545, 453 N.E.2d at 495, 466 N.Y.S.2d at 266; *Peoples,* 311 N.C. at 534, 319 S.E.2d at 188; *Commonwealth v. Taylor,* 294 Pa. Super. 171, 178, 439 A.2d 805, 807 (1982) (interpreting *Nazarovitch,* which left the issue open, not to apply to pre-hypnotic recollection).

In California, the rule of inadmissibility has not been evaluated in the context of testimony based on pre-hypnotic memory. *See People v. Guerra,* 37 Cal. 3d 385, 429, 690 P.2d 635, 664, 208 Cal. Rptr. 162, 191 (1985) (expressly reserving the question for decision in a case presenting such facts); *Shirley,* 31 Cal. 3d at 66-67, 641 P.2d at 804, 181 Cal. Rptr. at 272 (involving exclusion of hypnotically induced recollection).

[5] *See, e.g., People v. Smrekar,* 68 Ill. App. 3d 379, 388, 385 N.E.2d 848, 855 (1979); *House v. State,* 445 So. 2d 815, 824 (Miss. 1984); *State v. Hurd,* 86 N.J. 525, 545-46, 432 A.2d 86, 96-97 (1981); *State v. Beachum,* 97 N.M. 682, 689-90, 643 P.2d 246, 253-54 (N.M. Ct. App. 1981).

however, testimony about matters remembered and related prior to hypnosis is admissible.[6] Other courts permit admission of all testimony following hypnosis, with the trier of fact determining credibility.[7] Still another alternative requires the trial court to determine the admissibility of testimony of a witness who has previously undergone hypnosis, evaluating the reliability of the testimony on a case-by-case basis.[8]

We do not underestimate the potentially dangerous effects of hypnosis on a witness's testimony. The one certainty that emerges from the mass of expert opinion, well documented in the cases, is that manipulation of the mind through hypnosis may lead to uncertain and unreliable results. It is generally agreed that a person under hypnosis (1) is vulnerable to both conscious and unconscious suggestion, (2) may imagine details to fill gaps in his memory (confabulate) or intentionally fabricate facts to benefit himself or please the hypnotist, (3) may be unable to distinguish fact from fiction, both during and following hypnosis, and (4) may emerge from hypnosis with a strong subjective confidence in his subsequent recollection of the events recalled during hypnosis. *People* v. *Shirley*, 31 Cal. 3d 18, 57-66, 641 P.2d 775, 798-804, 181 Cal. Rptr. 243, 266-72, *cert. denied*, 459 U.S. 860 (1982); *State* v. *Iwakiri*, 106 Idaho 618, 622-23, 682 P.2d 571, 575-76 (1984); *State* v. *Peoples*, 311 N.C. 515, 520-24, 319 S.E.2d 177, 180-82 (1984); *State* v. *Hurd*, 86 N.J. 525, 534-43, 432 A.2d 86, 90-95 (1981); *People* v. *Hughes*, 59 N.Y.2d 523, 534-36, 453 N.E.2d 484, 489-90, 466 N.Y.S.2d 255, 260-61 (1983); *Commonwealth* v. *Nazarovitch*, 496 Pa. 97, 104-05, 436 A.2d 170, 173-75 (1981); *see also Greenfield*, 214 Va. at 715-16, 204 S.E.2d at 419.

█ All the problems inherent in testimony of a witness who has been subjected to hypnosis, however, relate to the competency of the witness, which depends on his capacity accurately to observe, remember, and communicate facts. We adhere to the view that it

---

[6] *See, e.g., Bundy* v. *State*, 455 So. 2d 330, 341 (Fla. 1984); *House*, 445 So. 2d at 824 n.6; *Beachum*, 643 P.2d at 252.

[7] *See, e.g., United States* v. *Awkard*, 597 F.2d 667, 669 (9th Cir.), *cert. denied*, 444 U.S. 885 (1979); *Creamer* v. *State*, 232 Ga. 136, 138, 205 S.E.2d 240, 241-42 (1974); *Pearson* v. *State*, 441 N.E.2d 468, 473 (Ind. 1982); *State* v. *Brown*, 337 N.W.2d 138, 151 (N.D. 1983); *State* v. *Glebock*, 616 S.W.2d 897, 903 (Tenn. Crim. App. 1981); *Chapman* v. *State*, 638 P.2d 1280, 1284 (Wyo. 1982).

[8] *See, e.g., United States* v. *Valdez*, 722 F.2d 1196, 1203-04 (5th Cir. 1984); *State* v. *Iwakiri*, 106 Idaho 618, 625-26, 682 P.2d 571, 579-80 (1984); *State* v. *Armstrong*, 110 Wis. 2d 555, 570, 329 N.W.2d 386, 394, *cert. denied*, 461 U.S. 946 (1983).

is the role of the trial court in the exercise of its discretion to determine the competency of witnesses. *Turnbull* v. *Commonwealth*, 216 Va. 328, 334, 218 S.E.2d 541, 546 (1975); *Helge* v. *Carr*, 212 Va. 485, 487-88, 184 S.E.2d 794, 795-96 (1971); *Kiracofe* v. *Commonwealth*, 198 Va. 833, 840, 97 S.E.2d 14, 18-19 (1957); *Burnette* v. *Commonwealth*, 172 Va. 578, 581-82, 1 S.E.2d 268, 269 (1939).

■ In determining the competency of previously hypnotized witnesses, a trial court should review the circumstances surrounding any hypnosis session. The court should consider any evidence of suggestion and should compare the subject's prior statements with those made after hypnosis. Obviously, to facilitate review in the trial court and on appeal it will be helpful to have a full and accurate record made of any hypnosis session.

■ In the present case, the trial court conducted a pretrial hearing, heard testimony concerning the hypnotic session, and heard expert testimony about the effects of hypnosis. It compared the substance of Griffin's pre-hypnotic statements with his testimony at the pretrial hearing and at trial. The court found that his testimony was unchanged and ruled that his testimony concerning his pre-hypnotic recollection was admissible. The record supports the finding and justifies the ruling.

The hypnotist was a doctor experienced in medical use of hypnosis. He was not affiliated with the prosecution, having performed hypnosis at the request of the police on only one prior occasion. He was not given extensive information about the case prior to the session. Although the session was not recorded, the evidence demonstrates that it was free of suggestiveness in any material respect. The evidence also shows that Hatcher's presence during hypnosis did not influence Griffin's testimony in any way.

■ Hopkins asserts that, even absent a finding of suggestiveness or altered testimony, Griffin's testimony should be excluded because his prior hypnosis and the unshakable confidence that may have resulted deprives Hopkins of the right to confront the witness against him by impeding his ability effectively to cross-examine Griffin. This argument is not persuasive.

Hopkins cross-examined Griffin on the substance of his testimony, pointing out minor inconsistencies between his preliminary hearing testimony and his trial testimony. He also cross-examined Griffin concerning his prior hypnosis. In addition, the trial court allowed Hopkins to introduce expert testimony about the effects of

hypnosis on a witness's recollection and confidence. These opportunities, together with a jury instruction permitting consideration of the effect of hypnosis on his confidence and manner of testifying, were sufficient to assure his right of confrontation. *See Clay v. Vose*, 771 F.2d 1, 4 (1st Cir. 1985); *Iwakiri*, 106 Idaho at 625-26, 682 P.2d at 579-80; *State v. Wren*, 425 So. 2d 756, 759 (La. 1983); *People v. Nixon*, 421 Mich. 79, 91-92, 364 N.W.2d 593, 599-600 (1984); *State v. Armstrong*, 110 Wis. 2d 555, 569-70, 329 N.W.2d 386, 393-94, *cert. denied*, 461 U.S. 946 (1983).

■ The instructions proffered by Hopkins dealt with the caution with which the jury should consider and the weight it should give Griffin's testimony if it believed hypnosis altered his "perception, knowledge, memory or recall." The trial court properly refused these instructions because there was no evidence in the record that hypnosis altered Griffin's perception, knowledge, or memory.

■ The trial judge properly concluded that Griffin's testimony was based on his independent recollection free of hypnotic suggestion. Because Griffin testified concerning facts recalled and recorded prior to hypnosis, the trial court did not abuse its discretion in admitting his testimony. We do not here decide, however, whether a trial court in its discretion may admit hypnotically induced testimony or whether a witness whose testimony has been altered by hypnosis is incompetent as a matter of law.

Hopkins next contends, as part of his argument challenging the sufficiency of the evidence, that the jury reached inconsistent results when it acquitted him of unlawful wounding but convicted him of abduction. Because Griffin's testimony was essential to each charge, he argues, the jury apparently engaged in speculation, disbelieving Griffin regarding the wounding but accepting his account of the abduction.

■ There is no merit to the contention that the verdicts returned by the jury were logically inconsistent. The jury could reject Griffin's testimony in part and accept it in part. As the Commonwealth suggests, the jury may have concluded that Griffin's wound, described as a "scratch" by several witnesses, was either accidentally inflicted during the struggle with Hopkins or incurred as he ran from the scene through dense foliage. Furthermore, the jury may have believed that he exaggerated the description of his own wounding in order to explain his fleeing the scene and leaving Kretschman behind.

██ Nor was Griffin's testimony inherently incredible. Major portions of his account were corroborated by the testimony of Carter, McBride, and various police officers. His testimony was also circumstantially corroborated by the physical evidence found with the remains and in Hopkins's car and by the laboratory analysis of these items.

Viewing the evidence and all reasonable inferences drawn therefrom in the light most favorable to the Commonwealth, *see Stockton* v. *Commonwealth*, 227 Va. 124, 145-46, 314 S.E.2d 371, 385, *cert. denied*, 469 U.S. 873 (1984), we hold that the evidence was sufficient to support the jury's verdict. We will affirm Hopkins's conviction of abduction.

*Record No. 840660—Affirmed.*
*Record No. 840745—Affirmed.*