UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Decker, Judges Fulton and Ortiz

JERMAINE JAMAR CAMERON

MEMORANDUM OPINION[*]

v.      Record No. 1986-22-1                PER CURIAM
                                            FEBRUARY 20, 2024

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
Leslie L. Lilley, Judge

(Bassel Z. Khalaf; Westendorf & Khalaf, PLLC, on brief), for
appellant.

(Jason S. Miyares, Attorney General; Aaron J. Campbell, Assistant
Attorney General, on brief), for appellee.


Following a bench trial, the trial court convicted Jermaine Jamar Cameron of shooting

from a motor vehicle, in violation of Code § 18.2-286.1, possessing a firearm having previously

been convicted of a felony, in violation of Code § 18.2-308.2, and three counts of maliciously

shooting at an occupied vehicle, in violation of Code § 18.2-154. Cameron argues on appeal that

the evidence was insufficient to support his convictions for maliciously shooting at an occupied

vehicle.[1] After examining the briefs and record in this case, the panel unanimously holds that

oral argument is unnecessary because "the appeal is wholly without merit." Code

§ 17.1-403(ii)(a); Rule 5A:27(a). For the following reasons, we affirm.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Cameron does not challenge his other convictions on appeal.

BACKGROUND

We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires that we "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

Read in the light most favorable to the Commonwealth, the evidence at trial showed the following. One afternoon in April 2021, Louis Soler was driving from Virginia Beach toward Norfolk in heavy traffic when he saw an Acura sedan speeding and aggressively cutting across lanes of traffic. Soler was driving a red Honda hatchback in the left lane. At one point, the Acura moved into Soler's lane and struck the front of Soler's car several times before completing the lane change in front of Soler. The Commonwealth submitted photographs depicting damage to Soler's car.

Soler testified that, "[a] few seconds after that," he saw a firearm stick out of the driver's side window and fire approximately seven shots "towards [him]." When the Commonwealth asked Soler if the shots were directed "at [Soler's] vehicle," Soler answered, "[y]es." None of the shots actually struck Soler's vehicle, and the following exchange occurred on cross-examination:

> Defense Counsel: And you wouldn't be in a position to say if [the bullets were] going to the left of . . . your vehicle, right of your vehicle, over your vehicle?
>
> Soler: The barrier. Yes. . . . I could see where the barrel was pointing down to the, I guess, it would be my left, so, yeah, the barrier.

Defense Counsel: Okay. So the gun was actually pointed to the side of your vehicle, correct?

Soler: Yes.

Soler, a Marine Corps reservist, recognized the firearm as a Glock handgun with an extended magazine. He described the arm holding the firearm as "completely black as if he was wearing gloves" but could not say whether the shooter was actually wearing gloves, nor could he see any of the Acura's occupants because it had blackout windows. Soler called the police and pulled into the right safety lane while the Acura continued driving.

Ciara Clark was driving behind Soler and also observed the Acura speeding and maneuvering through traffic. She saw the Acura merge into the left lane and collide with Soler, who was in the Acura's blind spot. She then "heard about four shots" and saw a black handgun out of the Acura's driver's side window "shooting back at the red car" that Soler was driving. The Acura then moved to the right lane and sped off.

Mariah Standing was driving in front of Soler, and she too noticed the Acura's aggressive driving. She saw the Acura merge into the left lane behind her and then saw the Acura's driver stick a firearm out of the driver's side door and "sho[o]t at the vehicle behind him." She did not remember how many shots she heard. She could see that there were two people in the Acura with dark skin but could not see any other identifying features. The Acura then "[j]ust continue[d] on like it was no big deal." Standing called the police and continued following the Acura until the police arrived.

Virginia State Police Trooper Walden located an Acura matching the description of the dispatch and followed it in an unmarked vehicle. He testified that he activated his emergency equipment and notified dispatch that he was in a pursuit when the Acura sped up "all of a sudden." The Acura cut across lanes of traffic and even crossed over into oncoming traffic as

Trooper Walden pursued it.  Ultimately, the Acura "clip[ped]" another vehicle and then drove across a field and into a ditch.

Trooper Walden approached the ditch on foot where he saw Cameron exit the driver's side door.  Trooper Walden identified himself as state police and ordered Cameron to stop, but Cameron fled in the opposite direction.  As Trooper Walden approached the Acura, Darius Griffin exited the vehicle from the passenger side, after which Trooper Walden lost sight of Cameron and took Griffin into custody.

Griffin testified that Cameron—Griffin's sister's cousin—was driving Griffin from Virginia Beach to Griffin's job in Chesapeake when "a driver hit [them] from the back." According to Griffin, Cameron "went to pull over," but when Griffin "went to go get out of the car," he "heard a lot of gunshots" so Cameron drove off again.  Griffin did not know how many gunshots he heard, who had fired them, or whether they had come from inside or outside the vehicle.  He testified that he never saw Cameron holding a firearm and never saw a Glock firearm in the car.

After Cameron drove off, he and Griffin noticed that another car was following them. Griffin removed his Taurus 9mm pistol from the glove compartment and placed it on the passenger's side floor because he did not know who was following them and wanted to have easy access to the firearm.  Griffin repeatedly asked Cameron to pull over and let him out of the car because he "was scared for [his] life."  Cameron responded that they could not stop because they did not know who was following them.  Cameron also stated that he could not stop because he thought he was "wanted."  At that point, Griffin began recording the interaction on his cell phone so that he did not "get criminalized or anything."  The video, which the Commonwealth submitted into evidence, depicts Griffin asking Cameron to stop the vehicle while Cameron explains that he "can't go back to jail."  The video then shows the vehicle crashing into a

water-filled ditch, Griffin advising Cameron to "just run," and Trooper Walden taking Griffin into custody.

Law enforcement located two firearms and firearm accessories inside the Acura. The first firearm was a Glock pistol with an extended magazine that the police found on the driver's side floorboard. The second firearm was a 9mm Taurus pistol that the police found in the passenger's side footwell, partially submerged in water. The police also found pistol magazines for the Glock in the passenger door pocket and an extended magazine for a 9mm firearm in a cloth bag in the vehicle's center console. The Glock was in mechanical operating condition. Law enforcement did not recover any latent fingerprints from the Glock or any of the cartridge casings in the Glock's magazine. The parties stipulated that someone other than Cameron had purchased the Glock at a pawnshop in February 2020. Finally, the Commonwealth submitted orders showing that Cameron had prior felony convictions.

The trial court denied Cameron's motion to strike and found him guilty of shooting from a motor vehicle, possessing a firearm having previously been convicted of a felony, and three counts of maliciously shooting at an occupied vehicle. In finding the evidence sufficient to support Cameron's convictions for maliciously shooting at an occupied vehicle, the trial court relied on Soler's testimony that the gun "was pointed at the side of his vehicle," as well as Clark's and Standing's testimony that the gun was fired at Soler's vehicle. The trial court then sentenced Cameron to 25 years' imprisonment with 16 years suspended.[2] On appeal, Cameron

---

[2] Specifically, the trial court imposed ten years' imprisonment with seven years suspended for each of Cameron's convictions for maliciously shooting at an occupied vehicle, with those sentences to run concurrently with each other. The court imposed five years' imprisonment, with none suspended, for possessing a firearm and ten years with nine years suspended for shooting from a motor vehicle.

argues that the evidence was insufficient to prove that he shot at Soler's vehicle as opposed to merely near Soler's vehicle.

ANALYSIS

"On review of the sufficiency of the evidence, 'the judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Shahan v. Commonwealth*, 76 Va. App. 246, 258 (2022) (quoting *Ingram v. Commonwealth*, 74 Va. App. 59, 76 (2021)). The question on appeal is "whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Rock v. Commonwealth*, 76 Va. App. 419, 434 (2023) (quoting *Nelson v. Commonwealth*, 73 Va. App. 617, 622 (2021)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Washington v. Commonwealth*, 75 Va. App. 606, 615 (2022) (quoting *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020)).

"Any person who maliciously shoots at . . . any motor vehicle . . . when occupied by one or more persons, whereby the life of any person . . . in such motor vehicle . . . may be put in peril, is guilty of a Class 4 felony." Code § 18.2-154. Cameron's sole argument on appeal is that the evidence was insufficient to prove that he shot at Soler's vehicle rather than at the highway barrier. In support of this argument, he focuses on Soler's testimony that the firearm barrel was pointed to the left of Soler's car and the fact that no bullets actually struck the car.

Cameron's argument is unavailing. In addition to the testimony about the barrier, Soler also testified clearly that the shooter shot at his vehicle. To the extent Soler made inconsistent statements, the fact finder "has the *sole* responsibility to determine [witness] credibility," which includes "resolving conflicts in a single witness'[s] testimony, accepting that part of the testimony it deems credible and rejecting the portion it deems incredible." *Commonwealth v.*

- 6 -

*McNeal*, 282 Va. 16, 22 (2011) (first quoting *Commonwealth v. Taylor*, 256 Va. 514, 518 (1998); and then citing *Hopkins v. Commonwealth*, 230 Va. 280, 293 (1985)). Further, the trial court may accept or discard all or part of the testimony it thinks proper. *Hammer*, 74 Va. App. at 240. Moreover, Clark testified that she saw the shooter fire the handgun "at the red car" that Soler was driving, and Standing testified that she saw the shooter "sho[o]t at the vehicle behind" the shooter, that is, Soler's car. This shooting came only "[a] few seconds after" Soler's and Cameron's vehicles collided. A reasonable fact finder could conclude based on this evidence that Cameron shot at Soler's vehicle in anger because of the collision. Such a conclusion matches the evidence far better than Cameron's alternative hypothesis that he fired shots at a highway barrier for no apparent reason.

Nor is Cameron saved by the fact that none of the bullets actually struck Soler's vehicle. The Supreme Court has explained that the word "at" in Code § 18.2-154 is "a function word to indicate that which is the *goal of an action* or that toward which an action or motion is directed." *Jones v. Commonwealth*, 296 Va. 412, 415 (2018) (emphasis added) (quoting *Webster's Third New Int'l Dictionary* 136 (1993)). In other words, the statute focuses on the shooter's intent, not the quality of his aim. It is sufficient that a reasonable fact finder could conclude that Cameron fired at Soler's vehicle, even if his bullets did not strike the vehicle.

Cameron does not argue that the Commonwealth failed to prove any of the other elements of the offense.[3] Accordingly, sufficient evidence supports each of his convictions for maliciously shooting at an occupied vehicle.

CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

*Affirmed.*

---

[3] Firing several gunshots at an occupied vehicle while in heavy traffic on the highway certainly demonstrates malice and poses a risk of peril to the vehicle's occupants. *See Alston v. Commonwealth*, 77 Va. App. 639, 652 (2023) ("Shooting a gun at a car is dangerous because '[b]ullets can unpredictably ricochet off one of the vehicle's surfaces and strike an occupant.'" (alteration in original) (quoting *Jones*, 296 Va. at 416)). Moreover, each discharge of a firearm is considered a separate offense under Code § 18.2-154. *Stephens v. Commonwealth*, 35 Va. App. 141, 145-47 (2001).