# Richmond

WALTER CARPENTER V. COMMONWEALTH OF VIRGINIA.

October 13, 1947.

Record No. 3274.

Present, *Hudgins, C. J., and Gregory, Eggleston, Spratley, and Buchanan, JJ.

*Note.—Former Chief Justice Holt sat during the argument of this case and before his death concurred in this opinion.

The opinion states the case.

W. A. Hall, Jr., and *John W. Fussell*, for the plaintiff in error.

*Abram P. Staples, Attorney General*, and *Ballard Baker*, for the Commonwealth.

SPRATLEY, J., delivered the opinion of the court.

The plaintiff in error was convicted of an assault and battery upon a little girl, seven years of age, whom he had taken into his home to rear and care for. The case was heard *de novo* in the Circuit Court of the city of Hopewell, upon an appeal from the Civil and Police Justice Court. The jury found him guilty and fixed his punishment at a fine of $500 and twelve months in jail.

The assignments of error are that the trial court refused the defendant permission to properly test the qualifications of the jurors, incorrectly admitted and rejected evidence, and improperly granted and refused certain instructions. It is also contended that the verdict of the jury was contrary to the law and evidence.

For the first time in the history of this court, we are

called upon to pass upon a question involving the measure of punishment which may be lawfully inflicted upon a child by a parent, or one standing *in loco parentis.*

The evidence may be summarized as follows:

Walter Carpenter had been married for four years, and, in 1945, with his wife lived in a trailer at a service station, in Hopewell, Virginia. They had no children of their own. Agnes Carpenter, seven years of age, was, in December, 1945, by her mother, placed in the care and custody of Mr. and Mrs. Walter Carpenter. The child's mother lived in North Carolina. Her father was dead. There is no blood relationship between the Carpenters and Agnes. Until the date of the happening hereinafter related, Agnes lived with the Carpenters, and by them was taken care of and provided for.

Late in the afternoon, on August 20, 1946, Horace T. Holt, sitting in the yard of his home, seventy-five feet from the trailer occupied by the Carpenters, heard a child crying. He saw Walter Carpenter come out of the trailer and get a switch off a tree and strip the leaves off it. Agnes· came out behind him and ran behind the trailer. When she went inside the trailer, Carpenter followed her with the switch in his hand. Holt then heard the child crying and screaming. He heard some "licks" being administered to her with a switch or some instrument for "possibly a couple of minutes or more." He called the police department. The police came, but did not go into the trailer and went away. Later he heard someone whipping the child again and the child crying and screaming. The police were again called; but made no investigation.

A. J. Lipscomb, who was also in the yard of Holt during the above occurrence, corroborated the testimony of Holt.

On August 21st, Mrs. A. J. Lipscomb and Mrs. C. L. Chapman testified that they saw the child, and observed that her legs were cut and bruised badly up to where her little dress came down; that her arms were bruised; and that she had a gash across her forehead and a bad bruise on her cheek.

On August 22nd, Carpenter was arrested on a criminal warrant issued on complaint of Holt, charging the former with cruelly beating the child. On that day, Mrs. Fanny S. Mohr, Superintendent of Public Welfare for the city of Hopewell, went to the trailer of Carpenter, and there found the little girl, Agnes. Mrs. Mohr testified as follows regarding the condition of the child:

"A. At the request of Judge Heflin I took the child to the office of the Department of Public Welfare, where I stripped the child's clothing off and examined her body. On her back, from her shoulders down to her buttocks, and on her buttocks, it was a mass of stripes, some of which were open and bleeding, and some had scabs on them. Of that portion of her body I would say there was not one-fourth of an inch that was not covered with a mass of those stripes; and also on her forehead there was a bruise, and there was a large gash right across her face; and the same as the scars that were on her body, her face and arms were covered with scars, which were partially healed, but still obvious; and her legs and arms were just a mass of these scars; and she was badly bruised from her hip down to her knees, on the inner side of her legs. It was just a bleeding mass of bruises.

"Q. Would you tell the jury whether the stripes on her back—you say they were bleeding?

"A. Some of them were bleeding, but some scabs were on them.

"Q. Now, will you indicate to the jury about the stripes on her back—in what direction were they?

"A. They were in all directions; some up and down, and some diagonally across her body.

"Q. Were they whelps or not?

"A. They were not whelps; they were gashes one-eighth of an inch wide; some longer than others.

"Q. And they extended from her shoulders down to the end of her body?

"A. Yes, sir, and they were open; they were new scars.

"Q. And then on her legs there was a mass of bruises?

"A. On the upper portion, from her buttocks to her knees, it was a mass of blue; there was no white flesh showing at all.

"Q. Was that the condition of the front of her legs?

"A. It was on the inside of her legs, down to her knees. And there were also scars which she had received at an earlier date, similar to those on her body. They were on her arms and legs. They were healed. There were no fresh scabs on them, but the scars were still there."

Agnes was, on the same day, August 22nd, placed in the custody of Mrs. Alice Green, where she remained for the next two weeks. Mrs. Green immediately undressed Agnes, and gave her a bath. As to the child's condition, she testified as follows:

"Q. Now, what was the condition of her back at that time?

"A. The condition of her back at that time was right bad.

"Q. Tell the jury what was the condition.

"A. It was bruised and also there was blood out of her back.

"Q. What kind of marks were on there where the blood had been drawn out?

"A. Where the blood was, that was by the switch.

"Q. How long were those marks?

"A. They were not so long, but they were cuts.

"Q. Were there any other marks on her besides those?

"A. Yes, she had some marks of a strap or a belt.

"Q. How could you tell that it was a strap or a belt?

"A. Well, I am a mother of three children and I should know.

"Q. How wide were they?

"A. Probably an inch.

"Q. And those that appeared to be made by a switch were narrow?

"A. Yes sir.

"Q. How about on her legs?

"A. She had quite a bit of bruises on her legs.

"Q. From a switch?

"A. Yes, and also from a belt.

"Q. Where were those marks?

"A. They were between her knees and her hips.

"Q. Was there any blood drawn from those?

"A. No, sir, the blood was drawn from her back."

Mrs. Green further said that some of the wounds made on the child indicated that they were made by a strap or belt. She described the difference between marks made by a switch or a blunter instrument, saying, "A mark made by a belt is wider; a kind of blister; the blood is brought to the surface; and a mark made by a switch is a scratch, and it shows some brusing."

The little girl, Agnes, was sworn as a witness. No examination to test her competency was made or requested. This is what she said about the whipping:

"Q. Now, Agnes, just a little while before Mrs. Mohr got you did either of these people whip you (indicating)?

"A. The man whipped me.

"Q. What did he whip you with?

"A. He whipped me with a belt and with a switch.

"Q. What part of your body did he whip?

"A. He whipped me all over, wherever he could whip me.

"Q. Now, did he make the blood come out of you?

"A. Yes, sir.

\* \* \*

"Q. Did he whip you with the switch first or with the belt first?

"A. With the switch first.

"Q. Then after he whipped you with the switch, he whipped you with the belt?

"A. Yes, sir.

"Q. Is that whipping what made those scars and bruises on your legs and body?

"A. Yes, sir."

Agnes further stated that she had formerly lived in the mountains, and in Richmond, and that the Carpenters had given her plenty of clothes, toys, a tricycle, a wagon, and candy.

Some of the witnesses said that Agnes was a well behaved and obedient child. Mr. and Mrs. Carpenter said she was stubborn, and would not cry aloud or scream when whipped.

The defendant admitted that he had whipped Agnes on August 20th, for taking, without permission, a box of candy belonging to his wife. He said he struck her five or six times and only with a small switch broken from a tree in the yard. He denied that he caused the described marks, wounds and welts found on the child's body. He declared that he had never seen them, and he was unable to account for them. He further testified that he had whipped the child on two former occasions, one time for begging on the street and another for stealing some candy from a store.

Mrs. Carpenter corroborated her husband as to the extent of the whipping given the child. Nothwithstanding the location of the marks and bruises on the child's body, she undertook to explain them by saying that they were scars from accidental wounds which the child kept sore by scratching with her fingernails. She said that good care had been taken of the child and that when Agnes was taken from their custody, there were taken with her thirty dresses and other clothing, including a new overcoat costing $17.50. She thought the cries and screams which were heard by her neighbors on August 20th came from a radio program which was being received in the Carpenter trailer.

Mrs. Carpenter was also arrested and charged with the same offense as her husband. By consent of the parties, her case was heard at the same time as that of her husband. During the trial, at the suggestion of the Commonwealth's Attorney, and by direction of the court, the jury retired and found Mrs. Carpenter not guilty. During a recess of the court, while the jury was out, Agnes went to Mrs. Carpenter, in the hall of the court building, and hugged and kissed her. Mrs. Mohr caught the child by the arm and took her away, and required the child to return to Mrs. Carpenter and to a witness in the case some money which they had given her.

The court's refusal to admit before the jury testimony of this conduct of Mrs. Mohr is assigned as error.

Carpenter was asked how much money he had spent on Agnes. The court refused to let him answer in the presence of the jury. Out of the hearing of the jury, he stated he spent $300. To this action of the court, error is assigned.

Throughout the trial of this case, and in the instructions to the jury, the relation of Carpenter to Agnes was treated as that of a person standing *in loco parentis.*

There were four instructions given to the jury. Objection was made to instruction number 1:

"The court instructs the jury that a parent or one standing in his place may be criminally liable as to assault and battery if he exceeds or abuses his authority to correct a child and inflicts corporal punishment which exceeds the bounds of due moderation in the measure of it or in the instrument used for the purpose."

The grounds of objection were that the instruction was "misleading," and "did not correctly state the law, in that one standing in the place of a parent may inflict corporal punishment which exceeds the bounds of moderation without being amenable to prosecution."

Three instructions, C, D, and E, setting out the theory of the defense in accordance with the grounds of the objection to instruction number 1 were refused.

Courts are agreed that a parent has the right to administer such reasonable and timely punishment as may be necessary to correct faults in his growing children. The right cannot be used as a cloak for the exercise of malevolence or the exhibition of uncontrolled passion on the part of the parent. Generally, it is held that persons standing *in loco parentis* have the same right in this respect as have natural parents; but there is a difference of opinion as to where lies the limit of lawful corection beyond which parents or persons standing *in loco parentis* lose the protection of law.

A few courts take the view that the test of criminal

responsibility is inflicting a permanent injury, or that the punishment proceeded from malice and not in the exercise of corrective authority. *State* v. *Jones*, 95 N. C. 588, 59 Am. Rep. 282; *Dean* v. *State*, 89 Ala. 46, 8 So. 38; *People* v. *Green*, 155 Mich. 524, 119 N. W. 1087, 21 L. R. A. (N. S.) 216.

However, the great preponderance of authority is to the effect that a parent has a right to punish a child within the bounds of moderation and reason, so long as he does it for the welfare of the child; but that if he exceeds due moderation, he becomes criminally liable. Many decisions supporting the majority view are cited and discussed in 21 L. R. A. (N. S.) 216; 37 A. L. R. 704; 43 A. L. R. 507; and 64 A. L. R. 292. Textwriters and authors of legal treatises are generally in accord: Wharton's Criminal Law, Vol. II, section 631, (9th Ed.); Brill's Cyclopedia of Criminal Law, Vol. I, section 429; 46 C. J., Parent and Child, section 5, page 1221; 4 Am. Jur., Assault and Battery, sections 57 and 58; 20 R. C. L., Parent and Child, section 17, page 606.

The majority rule is well expressed in a statement from 2 R. C. L. 542, approved in *State* v. *Spiegel*, 39 Wyo. 309, 270 P. 1064, 64 A. L. R. 289:

"The decided preponderance of authority, however, is that a parent in punishing his children must act in good faith with parental affection, must not exceed the bounds of moderation and must not be cruel or merciless, and that any act of punishment in excess of such limits is unlawful * * * Whether in any case punishment exceeded the bounds referred to above * * * is a question of fact for the jury, and they may determine it from the injuries inflicted."

In *State* v. *McDonie*, 89 W. Va. 185, 109 S. E. 710, this is said:

"A parent, or one standing *in loco parentis*, has the authority to administer chastisement or correction to his child. The moral sense of children is not sufficiently developed in all cases to admit of a successful appeal to the child to desist from wrongdoing without the aid of physical coercion, but it has never been recognized that this chastisement or

correction could go beyond what the child's reasonable welfare demands."

In *State* v. *Washington*, 104 La. 443, 29 So. 55, 81 Am. St. Rep. 141, a father was convicted of assault for beating his ten-year old child with a switch and walking cane, inflicting many permanent scars on the child's body. The action of the trial court in charging the jury that a parent had the right to chastise his child, but that "the chastisement should be done in moderation," was approved.

In *Steber* v. *Norris*, 188 Wis. 366, 206 N. W. 173, 43 A. L. R. 501, 507, the court said the general rule is "that one standing *in loco parentis* has the right to punish a child under his care, if the punishment is moderate and reasonable, and for the welfare of the child. * * * But whether the correction is reasonable and proper, or whether it is immoderate and excessive, does not rest absolutely in the discretion of the teacher or other person inflicting the injury. It is a matter of judicial investigation."

In *Hornbeck* v. *State*, 16 Ind. App. 484, 45 N. E. 620, the court said:

"If the punishment is excessive, unreasonable, or cruel, it is unlawful . . . Whether or not the punishment inflicted in this case was excessive or cruel was a question for the jury."

To the same effect, see *Hinkle* v. *State*, 127 Ind. 490, 26 N. E. 777; *Stanfield* v. *State*, 43 Tex. 167; *Commonwealth* v. *Blaker*, 1 Brewst. (Pa.) 311.

Instruction number 1 correctly lays down the rule which is supported by the great weight of authority and, in our opinion, by the better reasoning.

Instructions C, D, and E, offered by the defendant, were properly refused. They were in conflict with instruction number 1, in that they embodied the minority view that the beating must have caused the child permanent injury, or must have resulted from malice, and further took from the jury the right to determine whether the beating was unnecessarily harsh or cruel.

In this court, counsel who succeeded those who

represented the defendant in the trial court, contend that instruction number 1 was improper because of its failure to clearly and definitely define the words "due moderation." The definition of "due moderation" was not in question upon his trial. No definition was requested. The wounds and bruises on the body of the child bore mute and indisputable evidence that the child had been cruelly and brutally beaten. No one claimed that they were moderate or trivial. The defendant contented himself with denying that he inflicted them.

Words such as "due," "moderate," "necessary," and "reasonable" as applied to chastisement are ever changing according to the ideas prevailing in our minds during the period and conditions in which we live. Where a question is raised as to whether punishment has been moderate or excessive, the fact is one for the jury to determine from the attending circumstances, considering the age, size and conduct of the child, the nature of his misconduct, the nature of the instrument used for punishment, and the kind of marks or wounds inflicted on the body of the child. For the reasons stated, the necessity for defining the words used in instruction number 1 did not arise.

There is nothing in the record to indicate error in permitting the testimony of the child to be considered by the jury. Her testimony was principally confined to whether she had been whipped and the nature of the instrument employed in the whipping. She answered these questions intelligently. In addition, an examination of her competency was waived because of the failure of the defendant to request a preliminary examination of her, or object to her testimony at the proper time. Without the testimony of the child, there was sufficient evidence to show the guilt of the defendant.

The competency of a child of tender years to testify has often been considered by this court. The test of competency is customarily made by subjecting the child to a preliminary examination concerning its mental capacity, intelligence, and sense of moral responsibility. Since the

trial court has the opportunity of seeing the child, its demeanor on the stand, and manner of testifying, it has a superior means of judging its character and intelligence, and, therefore, we have held that the whole question of competency is largely left to the discretion of the trial court, and that its judgment will not be reversed except for manifest error. The subject has been fully and ably discussed by Judge Burks in *Rogers* v. *Commonwealth*, 132 Va. 771, 111 S. E. 231, wherein many cases are reviewed. The rule has been followed and approved in *Davis* v. *Commonwealth*, 161 Va. 1037, 171 S. E. 598.

In *Mullins* v. *Commonwealth*, 174 Va. 472, 5 S. E. (2d) 499, the principal witnesses for the Commonwealth were a four and one-half-year old child and her six and one-half-year old sister. The defendant was convicted of an attempt to commit rape upon the younger child. The children were permitted to testify without any preliminary examination, even though the defendant's counsel objected to their testifying. The conviction of the accused was based mainly upon the testimony of the two children. We held that while, undoubtedly, the trial court should have examined them to test their competency as witnesses, their testimony showed an unusual degree of intelligence for their tender years, and that the failure to make the accustomed examination was not reversible error. What we said there is equally applicable here.

However, we suggest that, in the future, the trial court, in similar circumstances, further satisfy itself as to the competency of an infant witness of tender years by making the usual examination of the intelligence and understanding of the child.

■ We do not think that the testimony of Mrs. Carpenter in respect to the action of Mrs. Mohr in taking the child from her and returning money given to the child by Mrs. Carpenter and a witness for the defendant showed bias or prejudice. This occurred immediately after Mrs. Carpenter had been acquitted. It was but a natural action on the part of the Superintendent of Public Welfare, who had

the child in charge and was familiar with all of the circumstances of the case. Moreover, the testimony showed that persons interested in the trial of Carpenter were extending favors to a material witness in his case. While there was no good reason to reject the testimony, it was at most harmless error.

It was also harmless error to refuse to permit the defendant to testify as to the amount of money he spent on the child. While it indicated his interest in the child, it had nothing to do with the question whether he had beaten her beyond proper limits. Besides, the jury had been fully informed that ample clothes, food, toys, and candy had been furnished the child by the defendant. The exact amount spent on her was immaterial, and added nothing to evidence disclosing the relationship existing between the child and her foster parent.

Finally, it is contended that the court erred in refusing to permit counsel to ask prospective jurors the following question:

"Do you believe that a man has the right as a parent to inflict proper punishment on a child?"

A jury should be composed of persons who will decide a case according to the law and the evidence, free from bias, prejudice, or fixed opinion. Prospective jurors should be examined accordingly to determine their qualifications. The question asked by the counsel for the defense was a question of law, as to which it was the duty of the court to instruct the jury. The question involved an attempt to ascertain the personal opinions of the prospective jurors rather than an inquiry to determine whether they would accept as a defense that which the law required as a defense. The jurors were sworn to render a true verdict according to the law and the evidence. By their oaths, they said that they had no prejudice which would prevent them from allowing any defense which the law recognized.

There was ample evidence to support the verdict of the jury. The jury were entitled to gather the intent of the defendant from the severity of the beating inflicted on

the child for merely filching some candy in the family home. The severity of the whipping showed an utter lack of a due appreciation of parental duty. This doubtless accounts for the imposition of the maximum punishment allowed by law.

On the whole case we find no error in the judgment complained of, and it is accordingly affirmed.

*Affirmed.*