COURT OF APPEALS OF VIRGINIA

Present: Judges Huff, Lorish and Callins
Argued by videoconference

**PUBLISHED**

TINA DIONE WOODSON

                                                                    OPINION BY
v.        Record No. 0610-21-2                             JUDGE LISA M. LORISH
                                                                      MAY 3, 2022

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF HANOVER COUNTY
Jan L. Brodie, Judge Designate

Dennis J. McLoughlin, Jr. (McLoughlin Law PLC, on brief), for
appellant.

Robin M. Nagel, Assistant Attorney General (Mark R. Herring,[1]
Attorney General, on brief), for appellee.

Virginia, like every other state, permits parents to discipline their children with corporal

punishment. This "parental privilege" excuses what would otherwise be battery in the ordinary

course. To fall within this justification, discipline must be reasonable and not excessive. Our

caselaw sets out a series of factors that help distinguish between acceptable and undue discipline.

But in each case decided by the Supreme Court and our Court upholding a lower court's

conclusion that discipline was excessive, the parent or caregiver inflicted significant physical

harm on the child. The harm was readily evident from the presence of more than transient

physical pain or temporary marks.

Tina Dione Woodson was convicted of assault and battery for disciplining her

twelve-year-old twins with a belt. While each child had some transient bruise or mark afterward,

neither was seriously injured. This case, therefore, requires us to consider for the first time

---

[1] Jason S. Miyares succeeded Mark R. Herring as Attorney General on January 15, 2022.

whether the combination of other facts was enough for criminal liability to result.  For the reasons set forth below, we must reverse and dismiss Woodson's convictions.

Background[2]

On the morning in question, Woodson's twelve-year-old twins ("son" and "daughter") were getting themselves and their younger siblings ready for the school day.  Son had a cell phone, and his phone alarm went off while he was out of the room.  Daughter picked up the phone to turn off the alarm.  Woodson saw her and suspected daughter was using the phone in violation of Woodson's rules about appropriate phone use.  Woodson took the phone and noticed a message on it, which concerned her because she had forbidden the twins from giving out the phone number to anyone.  Woodson then questioned the twins about who was sending messages to the phone and which one of them had given out the phone number.  Daughter acknowledged the message was from someone at school who was friends with both twins.  But both son and daughter denied being the one who gave out the number, each blaming the other.

Woodson asked son to get a belt from her closet and told the twins to lay on the bed.  She then hit them with the non-buckle end of the belt.  Daughter testified that the belt hit her on the bottom and legs, "more than between six and ten times," whereas son testified only that he was spanked without additional detail.  Woodson was 5'5" tall, weighed 135 pounds, and was recovering from surgery.  Daughter testified that she weighed about 57 to 59 pounds then, and photographs suggest son was also small for his age.  The twins then went to school for the day.

---

[2] "In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party at trial." *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381 (2016)).  In doing so, we discard any of appellant's conflicting evidence, and regard as true all credible evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence. *Id.* at 473.

Later that day, while at school, son approached the Hanover County sheriff's deputy working as a school resource officer and said that he did not feel safe going home. The record is unclear on the full extent of what son reported that day. At a minimum, he told the school resource officer, as well as a later-arriving investigator from the sheriff's office, about a "whipping" his father had given him with a belt over the weekend, and also that his mother had "spanked" him that morning with a belt. Son said he was sore from the spanking that morning. The school resource officer and investigator also spoke to daughter, who confirmed that she also did not feel safe going home. Neither child specifically identified their mother as the reason that they were afraid.

Both the school resource officer and investigator testified at trial that they observed bruises and marks on the twins, but there was some confusion over the source of the marks. The investigator had originally noted red marks and discoloration on son's thigh and face, but son explained that those marks had come from his father. The investigator testified that she saw bruises and marks consistent with a belt strap on daughter's back and thighs when she spoke to daughter that day, and she identified those same marks on the photographs introduced at trial.[3]

Two family services specialists from the Hanover County Department of Social Services also testified at trial, called by Woodson. Both had interviewed the twins after they left school that day. Both testified that while they observed some discoloration on the twins, they saw nothing that they would describe as linear marks or bruising.

The twins testified at trial and identified bruises in photographs that the investigator had taken. They told the court that those bruises came from Woodson's actions. Daughter pointed to marks on her back in a photograph and testified they looked like belt marks she had seen on her

_____

[3] The investigator also said that the bruise on daughter's back looked like "the outline of a belt buckle," but daughter specifically testified that Woodson only used the "long" part of the belt, not the metal portion.

skin when she looked in the mirror right after the incident. On cross-examination, however, she admitted telling the family services specialists that she had seen no red marks on her skin from the belt that day. Son identified a single mark on his leg in a photograph as originating from what he described as Woodson's "spanking."

Daughter also testified that she had been the one to give out the number to her brother's cell phone and that she had lied to her mother that morning. She also acknowledged that she had been in trouble with her mother for lying previously. Finally, daughter testified that Woodson messaged her after the incident telling daughter to go to the principal's office and say that she had lied about the event.

Woodson testified and denied using corporal punishment that day. She explained that daughter was not allowed to have a phone because of her prior behavior, but that she observed her using son's phone that morning. Woodson testified that she used other forms of punishment, such as restricting phone use and taking away the ability to do special activities.

Woodson moved to strike the Commonwealth's evidence, arguing that if the court found she had used corporal punishment, the evidence established a permissible spanking and not excessive discipline. This motion was renewed after the close of all the evidence. The trial court denied these motions and found Woodson guilty of two counts of assault and battery. The court explained that the testimony of son and daughter was "very credible," and found notable that they were scared to go home. The judge also observed that "[t]his was over a texting violation. So the question is what could have been done by a parent and what should have been done and what shouldn't have been done." The judge stated that "instead of taking the phone and restricting their privileges the mother had them go get a belt." Finally, the judge acknowledged that the "photos may not have shown everything that they should have shown but they showed

- 4 -

enough." For these reasons, the court found this was "excessive force for the violation considering the size of the children, the mother, the circumstances."

Woodson filed a written motion to set aside the verdict on the same grounds, which was also denied. By the time of the sentencing hearing, one month later, the twins were residing at the grandmother's home and the Department of Social Services was providing services to the family. The trial court sentenced Woodson to serve six months in jail on each count, with fifteen days of active time for each count and the remaining time suspended. This appeal followed.

Analysis

A battery is the "willful or unlawful touching of the person of another by the assailant, or by some object set in motion by him." *Wood v. Commonwealth*, 149 Va. 401, 404 (1927). An assault

> occurs when an assailant engages in an overt act intended to inflict bodily harm and has the present ability to inflict such harm or engages in an overt act intended to place the victim in fear or apprehension of bodily harm and creates such reasonable fear or apprehension in the victim.

*Carter v. Commonwealth*, 269 Va. 44, 47 (2005).

An intentional touching qualifies as a battery unless the actor has some legal justification or excuse. The presence of a justification or excuse transforms what would otherwise be a criminal offense into a permissible act. Common justifications for battery include consent and self-defense. Relevant here is another—domestic authority, which is sometimes described as the "parental privilege" to discipline a child with physical force.

Woodson argues that her convictions for assault and battery should be reversed because her actions constituted reasonable corporal punishment, falling within this parental privilege. "When reviewing the sufficiency of the evidence to support a conviction, [this] Court will affirm the judgment unless the judgment is plainly wrong or without evidence to support it." *Bolden v.*

*Commonwealth*, 275 Va. 144, 148 (2008). This inquiry requires us to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Wilson v. Commonwealth*, 53 Va. App. 599, 605 (2009). The standard is not without teeth, however. We must reverse a conviction when the "evidence creates only a suspicion or probability of guilt." *Yarborough v. Commonwealth*, 247 Va. 215, 218 (1994). This assignment of error also requires us to define the scope of the parental privilege to discipline, which involves both questions of law and fact. "We review questions of law, and mixed questions of law and fact, utilizing a *de novo* standard of review." *Muhammad v. Commonwealth*, 269 Va. 451, 479 (2005).

A. <u>The parental privilege to use corporal punishment must serve the well-being of children.</u>

A parent has the privilege to discipline his or her child "within the bounds of moderation and reason." *Carpenter v. Commonwealth*, 186 Va. 851, 861 (1947). This discipline may include corporal punishment. *Id.* This parental privilege has existed since the common law. *Eberhardt v. Commonwealth*, 74 Va. App. 23, 32 (2021); *see also* William Blackstone, 3 Blackstone's Commentaries on the Laws of England 120 (Oxford reprint 1992) ("[B]attery is, in some cases, justifiable or lawful; as where one who hath authority, a parent or master, gives moderate correction to his child, his scholar, or his apprentice.").

Because the privilege must serve the well-being of children, there are limits. "[S]tate interference with a parent's right to raise his or her child must be for the purpose of protecting the child's health or welfare." *Williams v. Williams*, 24 Va. App. 778, 783 (1997), *aff'd in part, modified in part*, 256 Va. 19 (1998). The potential for abuse cannot be taken lightly. Thus, the privilege cannot cloak punishment that causes, or threatens, serious harm. For this reason, we do not allow a parent to physically discipline a child if the discipline is "excessive" or

"immoderate." *Eberhardt*, 74 Va. App. at 33.  Such discipline inflicts, or creates a substantial risk of inflicting, significant harm.

Properly viewed then, the privilege protects diverse parenting values and practices while limiting the significant costs on the family that accompany state intervention.  In this way, the privilege generally serves the well-being of children—reflecting a trade-off between protecting children from the harm a parent may inflict and the harm that comes from unnecessary state interference.  Criminal proceedings may lead to incarceration or invasive community supervision, and civil intervention initiated by the child welfare system may lead to removal of the child from the home.  In this way, deference to parents provides a particularly important shield for low-income families and families of color who disproportionately experience state intervention.[4]

Drawing this line between acceptable physical force and unlawful conduct is challenging because "words such as 'due,' 'moderate,' 'necessary,' and 'reasonable' as applied to chastisement are ever changing according to the ideas prevailing in our minds during the period and conditions in which we live." *Carpenter*, 186 Va. at 863.  As is usually the case when the line is murky, the result is considerable discretion for prosecutors and employees of the Department of Social Services.  Our role is not to second-guess why this discretion is employed

---

[4] *See, e.g.*, Restatement of Children and the Law:  Defenses, Parental Privilege to Use Reasonable Corporal Punishment § 3.24 (Am. L. Inst., Tentative Draft No. 1, 2018) ("Low-income families and Black families are already disproportionately represented in the child welfare system, and the privilege thus protects these families from additional state interference."); Child Welfare Info. Gateway, U.S. Dep't Health & Hum. Servs., Admin. For Child and Families, Children's Bureau, *Child Welfare Practice to Address Racial Disproportionality and Disparity* (2021) at pp. 2-4, https://www.childwelfare.gov/pubpdfs/racial_disproportionality.pdf (discussing the "significant body of research" documenting "the overrepresentation of certain racial and ethnic groups in the child welfare system relative to their representation in the general population").

in an individual case, but we must ensure that the result satisfies our caselaw and the Constitution.

Starting at the beginning, our Supreme Court first set out factors that pertain to the reasonableness or excess of punishment in 1947:

> Where a question is raised as to whether punishment has been moderate or excessive, the fact is one for the jury to determine from the attending circumstances, considering the age, size and conduct of the child, the nature of his misconduct, the nature of the instrument used for punishment, and the kind of marks or wounds inflicted on the body of the child.

*Id.* The emotional state of the parent is another factor. *Harbaugh v. Commonwealth*, 209 Va. 695, 698 (1969) (parental privilege to discipline "cannot be used as a cloak for the exercise of uncontrolled passion").

To date, these factors have only been applied in four published decisions. Each of these cases involved significant physical harm to a child that overshadowed any passing consideration of the other listed factors. And in each case, the Supreme Court and our Court upheld the conclusion that the parent's significant physical harm to the child had crossed the line. In *Carpenter*, for example, the seven-year-old child's legs "were cut and bruised badly," her "arms were bruised," "she had a gash across her forehead and a bad bruise on her cheek," and her bottom was described as "a mass of stripes, some of which were open and bleeding, and some had scabs on them." 186 Va. at 855. The Department of Social Services worker who examined her summed up her physical condition as "just a bleeding mass of bruises." *Id.* at 856.

Likewise, in *Harbaugh*, the "undisputed evidence as to the wounds and bruises on the body of the child showed that he had been cruelly and brutally beaten." 209 Va. at 698. In particular, the five-year-old boy's "buttocks were badly bruised and showed blood marks with seepage therefrom." *Id.* at 696. The school nurse observed "purple marks and welts on the back

of both legs, and the outer layer of skin stuck to his underpants when they were removed," and the child was ultimately hospitalized for twelve days. *Id.*

The same was also true in a pair of child abuse cases. First, in *Campbell v. Commonwealth*, 12 Va. App. 476, 484 (1991), we described photographs depicting "an appalling story of a brutal beating of a three-year-old child" with marks from "his shoulder blades to his buttocks on his backside and from under his arm to his upper thigh on the right side of his body." We catalogued "thin, long bruises, purplish-brown in color," and other "atrocious marks" that were "well-defined, reddish half-ovals" near the child's right kidney and spinal column. *Id.* Finally, in *Eberhardt*, we affirmed a conviction in an opinion that detailed "at least ten lashes with a dog leash" that left "numerous linear marks and welts and significant bruising on various parts" of a child. 74 Va. App. at 35.

The seriousness of the physical injuries carried the day in each of these prior cases. While the other factors identified in these cases are important, we can think of no combination of "other" factors that could make a parent's discipline "reasonable" where it resulted in significant physical harm. Stated another way, once corporal punishment exceeds the significant harm threshold, the inquiry will typically be over.[5]

It must be said, however, that because our societal understanding of reasonable corporal punishment is "ever changing according to the ideas prevailing in our minds during the period and conditions in which we live," *Carpenter*, 186 Va. at 863, the significant and horrific abuse described in many of these old cases cannot set the threshold for when a child has experienced significant physical harm. Instead, significant physical harm is best understood as involving

---

[5] These cases decided by the Supreme Court and our Court have also arisen in the criminal context. Although the parental privilege to discipline is also relevant when the Department of Social Services alleges that a parent or caregiver has abused or neglected a child, this case considers only how the privilege applies in a criminal case.

- 9 -

injuries that are evidenced by something more than mere transient pain or minor temporary marks.[6]

A lack of significant physical harm does not end the analysis. This is where a factfinder must consider the totality of the circumstances and whether a parent's actions nevertheless place a child at risk of serious harm. Caselaw has identified several specific factors relevant to determining whether a parent's discipline placed a child at *risk* of serious harm, even without serious physical injury. *See, e.g.*, *Carpenter*, 186 Va. at 860, 863 ("cannot be used as a cloak for the exercise of malevolence," "age, size and conduct of the child, the nature of his misconduct, the nature of the instrument used for punishment"); *Harbaugh*, 209 Va. at 698 ("uncontrolled passion"). These circumstances could demonstrate that a child was at risk of serious harm, even if spared actual harm, and this would be enough to show that the parent's actions were unreasonable and fell outside the privilege.[7] Mere disagreement over a parent's decision to use corporal punishment in response to a child's particular misbehavior, without more, cannot meet this standard because it does not evince a risk of serious harm. A contrary holding would be

---

[6] Other states have likewise distinguished between significant physical harm and transient pain or minor temporary marks. *See, e.g.*, *State v. Wilder*, 748 A.2d 444, 455 (Me. 2000) (requiring state to prove that corporal punishment resulted in "physical injury greater than transient pain and/or temporary red marks or bruises"); *Commonwealth v. Dorvil*, 32 N.E.3d 861, 870 (Mass. 2015) (adopting the privilege in a criminal case as a matter of common law "provided that (1) the force used against the minor child is reasonable; (2) the force is reasonably related to the purpose of safeguarding or promoting the welfare of the minor, including the prevention or punishment of the minor's misconduct; and (3) the force used neither causes, nor creates a substantial risk of causing, physical harm (beyond fleeting pain or minor, transient marks), gross degradation, or severe mental distress"); Wash. Rev. Code § 9A.16.100 (1999) (presuming corporal punishment is unreasonable if it causes, or is likely to cause "bodily harm greater than transient pain or minor temporary marks"); *see also* Kandice K. Johnson, *Crime or Punishment: The Parental Corporal Punishment Defense–Reasonable and Necessary or Excused Abuse?*, U. Ill. L. Rev. 413, 472 (1998) (surveying states and concluding that physical injury falling outside the parental privilege required more than "transient red marks or temporary pain").

[7] To fit within the parental privilege in the first place, the parent's actions must be undertaken with a disciplinary purpose.

tantamount to allowing every trial judge to substitute their own parenting views for that of the parent. And it would conflict with our clear precedent permitting reasonable corporal punishment and insulating routine parenting decisions from state scrutiny.

In summary, to determine whether a parent's discipline was excessive or immoderate, a trial court must consider all the circumstances. When there is evidence of significant harm, distinguished from transient pain or temporary minor marks, that alone shows that the parental privilege does not apply. Absent significant harm, a factfinder may conclude that a combination of factors show the child was at risk of serious harm—which still makes the discipline unreasonable. But the nature of the child's misconduct, and the trial court's view that the misbehavior did not warrant corporal punishment, cannot be the primary factor.

B. Applied here, the Commonwealth failed to prove Woodson's punishment was unreasonable.

Here, the Commonwealth established at trial that Woodson found a text message on son's phone. Neither he nor daughter were allowed to give out the phone number to friends, and Woodson questioned both twins about who had broken the rule. Both twins denied giving out the number to their friend, blaming the other. Woodson then instructed son to get a belt. She told the twins to lay on the bed and hit each of them with the non-buckled end of the belt. Son sustained a single bruise to his thigh and was "sore" on his back. Daughter sustained a single bruise on her back and some bruises on her thigh. There was no evidence that Woodson carried out this punishment in a state of anger or rage, or that it was done in a degrading way.

Both children attended school after this punishment and did not require medical attention. While the twins reported that they did not feel safe going home after school, it is far from clear that it was their mother (and not their father) that was the cause of the fear—at least they never said they were afraid of her specifically. While the school resource officer and police investigator testified at trial that they observed a few bruises on the twins while at school, a

family services specialist and investigator for the Department of Social Services who interviewed the twins later that day noted no bruising and only some discoloration.

In concluding that parental privilege did not apply, the trial court explained that the testimony of the two children was "very credible" and considered their fear in returning home. The court observed that "the photos may not have shown everything that they should have shown but they showed enough." Then the court explained that "[t]his was over a texting violation. So the question is what could have been done by a parent and what should have been done and what shouldn't have been done." Finally, the court determined that

> [t]he evidence was that instead of taking the phone and restricting their privileges the mother had them go get a belt, the children were laid across a bed and they were hit with the belt. In this court's opinion, that's excessive force for the violation considering the size of the children, the mother, the circumstances.

No one has argued that this case involved significant physical harm, and a reasonable factfinder could not conclude that the combination of other factors demonstrate that the discipline that morning placed the twins at risk of serious harm. While the court mentioned that Woodson used a belt, her use of the soft end of a belt was not so unusual, cruel, or degrading without the presence of significant injury or other evidence about the number or location of the strikes. Neither could Woodson's size change this calculus since she was of average height and build. That both twins expressed fear of returning to their home is a matter of serious concern, but there was insufficient evidence here that this fear was linked to Woodson in particular, or that the fear reflected the reasonableness of the *specific* instance of corporal punishment Woodson had administered that morning and which was the basis for the battery charges.[8]

---

[8] In contrast, the general home environment and a child's fear would certainly be relevant to the circumstances that the Department of Social Services would need to consider in determining whether to bring a petition alleging abuse and neglect. We note that the Department was active in working with this family following this incident.

Instead, the primary factor the trial court relied on was the nature of the twins' misconduct. The court characterized what occurred as a mere texting violation and suggested that Woodson should have made a different parenting decision—taking the phone away from them or restricting their phone privileges—instead of using corporal punishment. Parenting is an inordinately difficult task, and a criminal prosecution cannot rest on a debatable parenting decision without other evidence that the conduct was excessive. Disagreement with Woodson's decision to use corporal punishment, combined with evidence of only transient marks from the soft end of a belt, falls short of what a reasonable factfinder could conclude is excessive.

Applying our understanding of the scope of the parental privilege to use reasonable corporal punishment to these circumstances, we conclude that the evidence creates only a suspicion or probability of guilt and falls short of what a rational trier of fact could find excessive beyond a reasonable doubt. As a result, we reverse and dismiss.

*Reversed and dismissed.*