COURT OF APPEALS OF VIRGINIA

Present:   Judges AtLee, Fulton and Raphael
Argued at Norfolk, Virginia


RYHEEM JASUAN HARGROW PUGH

MEMORANDUM OPINION* BY
v.        Record No. 0896-24-1      JUDGE RICHARD Y. ATLEE, JR.
                                    DECEMBER 9, 2025

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF PORTSMOUTH
Johnny E. Morrison, Judge

Catherine French Zagurskie, Chief Appellate Counsel (Virginia
Indigent Defense Commission, on briefs), for appellant.

Matthew J. Beyrau, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a jury trial, the trial court convicted Ryheem Jasuan Hargrow Pugh of second-degree murder, shooting another in the commission of a felony, and use of a firearm in the commission of a felony. Pugh raises multiple issues on appeal. First, he argues that the trial court erred by refusing his right-to-arm jury instruction. Second, he contends that the trial court abused its discretion by admitting evidence of the presence of children at the time of the offense. Next, he challenges the trial court's refusal of two of his proposed voir dire questions. Finally, he argues that convicting him of both shooting another in the commission of a felony and use of a firearm in the commission of a felony violates the principles of double jeopardy. For the following reasons, we disagree and affirm the decision of the trial court.

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

## I. BACKGROUND

"On appeal, we review the evidence in the 'light most favorable' to the Commonwealth," the prevailing party below. *Clanton v. Commonwealth*, 53 Va. App. 561, 564 (2009) (en banc) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)).

On the morning of June 1, 2023, Pugh accompanied his girlfriend, Angel Bryant, to drop Bryant's children off at daycare. Pugh had spent the previous night at Bryant's apartment. Pugh placed his firearm in the pocket of his sweatshirt before he left the apartment. He later explained to police that he regularly carries a firearm.

Bryant spent several hours throughout the early morning texting Rocco Nixon, the father of her children. During that text conversation, Nixon made several threats towards Pugh, and Bryant challenged Nixon to "pull up" to her apartment to confront Pugh. Nixon continued to make threats directed at Pugh. Before leaving the apartment to drop the children off, Bryant told Pugh about the text conversation, and Pugh became angry and upset.

On the way to the daycare, Bryant drove the vehicle and Pugh sat in the passenger seat. As Bryant approached the daycare, Nixon began following her car. Bryant told Pugh that she believed Nixon was behind them. Nixon did not normally participate in dropping the children off at daycare, so Pugh was "caught . . . off guard" by seeing Nixon. Although Pugh did not normally get out of the car when dropping Bryant's children off, he exited the car as soon as Bryant parked. Bryant remained in the car with her children.

Pugh then stood on the lawn of the daycare with his hands in his sweatshirt pocket, holding his firearm. Pugh was wearing a neck gaiter which he had pulled up to cover a portion of his face. Nixon arrived thereafter and quickly exited his car, leaving his two other children in his vehicle. Nixon approached Pugh, exclaiming, "[y]ou thought I was playing with you[,]" and Pugh backed away from Nixon. When Nixon continued moving toward Pugh and put his hand "down to the side

- 2 -

of his pants[,]" Pugh took his firearm out of his pocket and shot Nixon "three or four times." Nixon then fell to the ground and rolled over, and Pugh saw that Nixon was unarmed. Pugh then shot Nixon several more times while Nixon was on the ground. In total, Pugh shot Nixon eight times. Pugh then ran down the street, leaving the scene.

Shirley Cherry, the owner of the daycare, was inside with students when she heard a "banging noise" coming from outside. Seeing one of her students looking out the window, Cherry approached, looked out, and saw someone running down the street. When Cherry went to the front entrance, she saw a man lying on the ground. Cherry heard someone crying for help, and she called 911. Nixon was taken to the hospital and rushed into emergency surgery, but he ultimately died from the gunshot wounds.

Police arrested Pugh the following day, and a grand jury subsequently indicted him on the charges of first-degree murder and second-degree murder, in violation of Code § 18.2-32, shooting another during the commission of a felony, in violation of Code § 18.2-53, and use of a firearm in the commission of a felony, in violation of Code § 18.2-53.1.

Before trial, Pugh filed a motion *in limine* to exclude any evidence or testimony regarding the presence of children at the time of the alleged offense. Pugh argued that the evidence was not relevant and was more prejudicial than probative. The trial court denied the motion after hearing argument.

During voir dire, the trial court sustained the Commonwealth's objections to two of Pugh's proposed voir dire questions. Pugh's proposed Question 20 provided:

> The law in Virginia is that if a person reasonably believes themselves in danger of being harmed, they may use whatever force is reasonably necessary to protect themselves from that harm.
> a. Does anyone here disagree with that law?
> b. Does anyone think that deadly force is never necessary to protect someone?

c. Is there anyone who thinks that deadly force should never be used to protect yourself unless you actually see the other person holding a deadly weapon?

Proposed Question 25 asked, "Who here believes that a criminal defendant has a duty to bring forth some evidence to prove his innocence?" The trial court excluded both questions. It found that Question 20 was not an accurate statement of the law. It then found Question 25 to be duplicative of Pugh's proposed Question 26, which sought to ascertain whether prospective jurors could follow the instruction that Pugh was not required to testify.[1] The trial court gave Pugh the option to ask either Question 25 *or* Question 26, and Pugh opted to ask Question 26.

Once the Commonwealth rested its case, Pugh moved to strike the charge of shooting another in the commission of a felony, arguing that it would violate the principles of double jeopardy for him to be convicted of both that offense and the use of a firearm in the commission of a felony offense. The trial court denied the motion. Pugh renewed his motion to strike at the conclusion of all of the evidence, which the trial court again denied.

---

[1] Question 26 provided:

The Court is going to instruct you that Mr. Hargrow Pugh does not need to testify in his own defense and that you cannot consider his silence as evidence of guilt or hold it against him in any way.
a. Is there anyone who would be unable or unwilling to follow that instruction?
b. If Mr. Hargrow Pugh chooses not to testify, is there anyone who would tend to believe that he's guilty because of it?
c. Is there anyone here who thinks, if a person is innocent, you would expect them to take the stand to at least declare that they are innocent?

Prior to closing arguments, the parties conferred with the trial court regarding proposed jury instructions.[2]  Pugh asked the court to give Instruction A, which was the right-to-arm instruction. That instruction provided:

> A person who reasonably believes that another intends to attack him for the purpose of killing him or doing him serious bodily harm has a right to arm himself for his own necessary self-protection.  In such a case, no inference of malice can be drawn from the fact that he armed himself.

The Commonwealth objected to the instruction, and the trial court sustained the objection, finding that the instruction was not supported by the evidence.  Ultimately, the jury convicted Pugh of second-degree murder, use of a firearm in the commission of a felony, and shooting in the commission of a felony.  Pugh now appeals.

## II. ANALYSIS

A. *The trial court did not err in refusing the right-to-arm jury instruction.*

Pugh argues that the trial court erred in refusing his proffered right-to-arm jury instruction. We disagree.

"A reviewing court's responsibility in reviewing jury instructions is 'to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" *Fahringer v. Commonwealth*, 70 Va. App. 208, 211 (2019) (quoting *Darnell v. Commonwealth*, 6 Va. App. 485, 488 (1988)).  "This Court reviews the trial court's decisions in giving or denying jury instructions under an abuse of discretion standard." *Id.*

It is undisputed that the proffered right-to-arm instruction is a correct statement of law.  And where a proffered jury instruction is an otherwise correct statement of law, such instruction is "proper only if supported by more than a scintilla of evidence." *Commonwealth v. Cary*, 271 Va.

---

[2] This was an off-the-record discussion conducted outside the presence of the jury.  The trial court later allowed the parties to proffer the arguments raised during this discussion for the record.

87, 100 (2006) (quoting *Commonwealth v. Sands*, 262 Va. 724, 729 (2001)). Conversely, "[a]n instruction is properly refused when it is unsupported by the evidence." *Bennett v. Commonwealth*, 8 Va. App. 228, 234 (1989). "When reviewing a trial court's refusal to give a proffered jury instruction, we view the evidence in the light most favorable to the proponent of the instruction." *Commonwealth v. Vaughn*, 263 Va. 31, 33 (2002).

A "right to arm instruction is required only where the evidence fairly suggests that the accused obtained the firearm in *preparation* for a *future* deadly attack." *Lynn v. Commonwealth*, 27 Va. App. 336, 348 (1998). In other words, at the moment Pugh armed himself, he had to do so in response to a perceived threat of harm. *Wilson v. Commonwealth*, 25 Va. App. 263, 274 (1997).

Here, the evidence fails to demonstrate that Pugh armed himself in anticipation of any future attack. Pugh told police he regularly carried a firearm. *See Boggs v. Commonwealth*, 199 Va. 478, 489 (1957) (refusing a right-to-arm instruction where defendant told police it was his habit to carry a firearm). Furthermore, when he was interviewed by law enforcement, Pugh specifically denied that he carried his firearm because he expected to see Nixon that morning. It is immaterial that Pugh knew about Bryant's text conversation with Nixon prior to leaving the apartment because, by his own admission, Pugh was "caught . . . off guard" when he saw Nixon. Pugh's own statements reflect that he did not expect to see Nixon and he was not expecting any attack or trouble. Given these statements and his habit of routinely carrying a firearm, the trial court did not err in refusing an "instruction which is predicated upon the fact that he anticipated trouble from [Nixon] and carried the [firearm] because of that fact." *Boggs*, 199 Va. at 489.

Pugh argues that a person may "arm himself" for the purposes of a right-to-arm instruction at more than one moment. He relies on *Cary v. Commonwealth*, No. 2031-03-1, slip. op. at 12,

- 6 -

2004 Va. App. LEXIS 623, at *23 (Dec. 21, 2004).[3]  In *Cary*, the Court held that the defendant armed herself at "three discre[te] times": when she purchased the firearm; when she took the firearm from her son and placed it on the couch next to her; and when she picked it up from the couch and pointed it at the approaching victim.  *Id.*  Pugh contends that he too armed himself at several distinct points, including both when he put the gun in his pocket that morning and when he pulled the gun out when he was approached by Nixon in front of the daycare.

Even if we were to accept Pugh's argument, the facts here are distinct from those in *Cary*. In *Cary*, at each separate moment that this Court found that the defendant armed herself, she did not already have the firearm on her person.  *Id.*  Here, the firearm was on Pugh's person from the moment he placed it into his pocket prior to leaving the apartment that morning.  At no point did he remove it from his person.  Even if an individual may arm themselves at several separate instances over the course of an incident, we cannot conclude that this occurred where the individual was continuously armed, as Pugh was here.  Therefore, we conclude that Pugh armed himself when he placed his firearm in his pocket prior to leaving the apartment.  Because the evidence established that Pugh did not arm himself in preparation for any attack, the trial court did not err in refusing the right-to-arm instruction.

B. *The testimony regarding the presence of children was properly admitted into evidence.*

Pugh argues that the trial court erred in denying his motion *in limine*.  He contends that evidence that children were present at the time of the offense was both irrelevant and more prejudicial than probative.  We find no error in the trial court's action.

"It is well established that 'the admissibility of evidence is within the discretion of the trial court' and an appellate court will not reject the decision of the trial court unless it finds an

_____

[3] "Although not binding precedent, unpublished opinions can be cited and considered for their persuasive value."  *Otey v. Commonwealth*, 61 Va. App. 346, 350 n.3 (2012) (citing Rule 5A:1(f)).

abuse of discretion." *Hicks v. Commonwealth*, 60 Va. App. 237, 244 (2012) (quoting *Midkiff v. Commonwealth*, 280 Va. 216, 219 (2010)).

Pugh's contention that the evidence is irrelevant is misguided. Evidence must be relevant to be admissible. Va. R. Evid. 2:402. Evidence is relevant if it "ha[s] any tendency to make the existence of any fact in issue more probable or less probable than it would be without the evidence." Va. R. Evid. 2:401. Evidence is irrelevant if it has "no tendency to prove guilt." *Smith v. Commonwealth*, 223 Va. 721, 723 (1982) (quoting *Bunting v. Commonwealth*, 208 Va. 309, 314 (1967)).

Here, the evidence regarding the presence of children was relevant to aid the jury in assessing the level of threat posed by Nixon at the time of the offense. The jury was required to determine whether Pugh shot and murdered Nixon as charged, or whether Pugh shot Nixon in self-defense, as Pugh argued. A reasonable fact finder could have inferred that the presence of children made Nixon less of a threat. Thus, the evidence was relevant to rebut Pugh's self-defense claim.

Next, Pugh contends that, even if relevant, the evidence was unfairly prejudicial. Specifically, he argues that any probative value of the evidence is slight and is substantially outweighed by the evidence's tendency to invite a decision based on emotion.

It is well-settled that "[r]elevant evidence may be excluded if . . . [its] probative value . . . is substantially outweighed by . . . the danger of unfair prejudice[.]" Va. R. Evid. 2:403(a)(i). The "responsibility for balancing the competing considerations of probative value and prejudice rests in the sound discretion of the trial court." *Walker v. Commonwealth*, 302 Va. 304, 320 (2023) (quoting *Ortiz v. Commonwealth*, 276 Va. 705, 715 (2008)). Evidence is unfairly prejudicial if it has a tendency to "inflame the passions" of the jury "or to invite decision based upon a factor unrelated to the elements of the claims and defenses in the pending case." *Lee v. Spoden*, 290

Va. 235, 251 (2015). The "fact that evidence is highly prejudicial to a party's claim or defense is not" dispositive in applying the Virginia Rule of Evidence 2:403 balancing test. *Id.* at 252. Indeed, "all probative direct evidence generally has a prejudicial effect to the opposing party." *Walker*, 302 Va. at 320 (quoting *Lee*, 290 Va. at 251). Instead, "relevant evidence will only be excluded if its prejudicial nature *substantially* outweighs its probative value." *Conley v. Commonwealth*, 74 Va. App. 658, 673 (2022).

Here, we find that the trial court did not abuse its discretion in balancing the probative value of the evidence with any undue prejudice. The evidence was probative both of whether Pugh shot Nixon in self-defense and of why the altercation occurred when and where it did. Although evidence regarding the presence of children may have been prejudicial to Pugh's case, it is well-settled that "all probative direct evidence generally has a prejudicial effect to the opposing party." *Lee*, 290 Va. at 251. Nothing suggests that the evidence rose to a level that "inflame[d] the passions of the [jury]" or "invite[d] decision based upon a factor unrelated to the elements" of the charged offenses and relevant defense. *Id.* Moreover, a defendant is not entitled to have the evidence sanitized. *Gregory v. Commonwealth*, 46 Va. App. 683, 696-97 (2005). Accordingly, we find that the trial court did not err by admitting testimony regarding the presence of children into evidence.

C. *The trial court did not abuse its discretion by limiting Pugh's voir dire.*

Pugh argues that the trial court erred in refusing to permit two proposed voir dire questions. Specifically, Pugh argues that he should have been permitted to ask Question 20, which related to self-defense, and Question 25, which he claims would disclose any juror bias. We find that the trial court did not err in refusing either voir dire question.

Generally, counsel has the right to ask prospective jurors relevant questions "to ascertain whether the juror can sit impartially in either the guilt or sentencing phase of the case." Code

§ 19.2-262.01. "It is well-established that the manner of conducting voir dire, including the exclusion of questions to the venire, is committed to the trial court's discretion and we review its ruling only for abuse of that discretion." *Lawlor v. Commonwealth*, 285 Va. 187, 212 (2013). The burden is on the objecting party to show "that the trial court abused its discretion in limiting the scope of *voir dire* and . . . that the jury panel lacked impartiality or that the jury selection process the [trial] court employed was prejudicial." *Skipper v. Commonwealth*, 23 Va. App. 420, 427-28 (1996) (citations omitted).

1. *Question 20 was an incomplete statement of the law on self-defense and merely sought to ascertain the personal opinions of prospective jurors.*

Pugh contends that his proposed Question 20 was an accurate statement of the law on self-defense and did not merely seek to ascertain the personal opinions of the prospective jurors. We disagree.

Instructing the jury on the law is a role of the trial judge and a defendant cannot, through voir dire, intrude upon that role. *Carpenter v. Commonwealth*, 186 Va. 851, 865 (1947) (noting that counsel may not ask prospective jurors "a question of law, as to which it [is] the duty of the court to instruct"). But parties *may* use voir dire to evaluate the capacity of prospective jurors to apply and follow that law. *Id.* Pugh argues that Question 20 properly serves the purpose of ascertaining the capacity of the jury to evaluate a self-defense argument. He characterizes Question 20 as a proper "inquiry to determine whether the jury would accept self-defense as a defense to the charges." We reject Pugh's characterization for two reasons.

First, Question 20 is an incomplete statement of the law on self-defense. Question 20 refers only to the general principle of self-defense law in Virginia.[4] *See Diffendal v.*

---

[4] Virginia recognizes two forms of self-defense: justifiable self-defense and excusable self-defense. *Bell v. Commonwealth*, 66 Va. App. 479, 487 (2016) (distinguishing justifiable homicide in self-defense, where one kills another without any fault of his own "under reasonable apprehension of death or great bodily harm[,]" from excusable homicide in self-defense, where

- 10 -

*Commonwealth*, 8 Va. App. 417, 421 (1989) (recognizing that "a person who reasonably apprehends bodily harm by another is privileged to exercise reasonable force to repel the assault"). Question 20 makes no attempt to distinguish or describe further what Virginia law defines as self-defense. Pugh even acknowledged at trial that the question was "not . . . a full statement of the law." We cannot conclude that the question serves the purpose of ascertaining the capacity of the jurors to evaluate the defense where the question does not fully capture what the law on that defense is.

Second, Question 20 merely asks whether the prospective jurors *agree* with the law on self-defense. We view this as "an attempt to ascertain the personal opinions of the prospective jurors rather than an inquiry to determine whether they would accept as a defense that which the law require[s] as a defense." *Carpenter*, 186 Va. at 865. Whether a prospective juror agrees with a law is irrelevant so long as that prospective juror manifests that he or she will follow that law and the court's instructions notwithstanding any personal opinions. *Boblett v. Commonwealth*, 10 Va. App. 640, 648 (1990). And the proffered question here makes no such attempt to ascertain whether a prospective juror will follow the law on self-defense.[5] Accordingly, we find that the trial court did not abuse its discretion by excluding Pugh's proffered Question 20.

---

one is involved to some degree in provoking the altercation but thereafter retreats and "announces his desire for peace" before exercising deadly force "from a reasonably apparent necessity" (quoting *Bailey v. Commonwealth*, 200 Va. 92, 96 (1958))).

[5] For this reason, we are unpersuaded by Pugh's contention that the jury selection process was prejudicial because he was denied the opportunity to determine whether the jury pool was impartial to the law of self-defense.

2. *Question 25 was duplicative of other questions asked to the venire.*

Pugh argues that the trial court improperly restricted his voir dire by making him elect between proposed Question 25 or Question 26. We hold that the trial court properly excluded Question 25.

Reviewing the entire voir dire, we conclude that the trial court "afforded [Pugh] a full and fair opportunity to ascertain whether jurors could stand indifferent in the cause." *Lawlor*, 285 Va. at 216 (quoting *Bell v. Commonwealth*, 264 Va. 172, 196-97 (2002)). "A party does not have a right to 'propound any question he wishes, or to extend *voir dire* questioning *ad infinitum*.'" *Juniper v. Commonwealth*, 271 Va. 362, 396 (2006) (quoting *LeVasseur v. Commonwealth*, 225 Va. 564, 581 (1983)). Nor is a party "entitled to ask the members of the venire [a] question repetitively or in his preferred form." *Lawlor*, 285 Va. at 216.

Pugh argues that Question 25 was necessary because it would have led to the disclosure of a juror's bias against the required burden of proof, but this information was sufficiently elicited by the Commonwealth's Question 15, which asked whether the jurors "underst[ood] that the Commonwealth has the burden of proving that the defendant is guilty of the crime charged beyond a reasonable doubt[.]" Thus, Question 25 was merely duplicative of the Commonwealth's Question 15. And because we find these questions to be duplicative, we reject Pugh's contention that the trial court's exclusion of his Question 25 resulted in a prejudicial jury selection process. Accordingly, we conclude that the trial court imposed a "proper limitation[] on [Pugh's] right to examine prospective jurors" by disallowing Pugh's proposed Question 25. *Skipper*, 23 Va. App. at 427.

D. *Conviction under both Code § 18.2-53 and Code § 18.2-53.1 in a single-trial setting does not violate the principles of double jeopardy.*

Pugh argues that convicting him under both Code § 18.2-53 and Code § 18.2-53.1 violates the constitutional protections against double jeopardy. Specifically, Pugh argues that

- 12 -

conviction under both statutes in a single-trial setting imposes multiple punishments for the same offense. We disagree.

"The Fifth Amendment to the Constitution of the United States declares that no person shall 'be subject for the same offence to be twice put in jeopardy of life or limb.'" *Severance v. Commonwealth*, 295 Va. 564, 571-72 (2018) (quoting U.S. Const. amend. V). "In the simultaneous-prosecution context, the prohibition against double jeopardy protects against 'multiple punishments for the same offense.'" *Id.* at 572 (quoting *Commonwealth v. Gregg*, 295 Va. 293, 298 (2018)). However, "where the same conduct is used to support convictions for separate and distinct crimes," the constitutional protections against double jeopardy do not apply. *Brown v. Commonwealth*, 37 Va. App. 507, 517 (2002). "We review de novo whether 'multiple punishments have been imposed for the same offense in violation of the double jeopardy clause.'" *Gregg*, 295 Va. at 296 (quoting *Johnson v. Commonwealth*, 292 Va. 738, 741 (2016)).

"When considering multiple punishments for a single transaction, the controlling factor is legislative intent." *Id.* at 298 (quoting *Kelsoe v. Commonwealth*, 226 Va. 197, 199 (1983)). To determine legislative intent, we "first look[] to the plain language of the statute[s]." *Davis v. Commonwealth*, 79 Va. App. 123, 138 (2023). If the statutory language is unambiguous, we "will assign the statute its plain meaning." *Groffel v. Commonwealth*, 70 Va. App. 681, 687 (2019) (quoting *Browning-Ferris Indus. of S. Atl. v. Residents Involved in Saving the Env't, Inc.*, 254 Va. 278, 284 (1997)). However, if the statutory language *is* ambiguous, we apply the *Blockburger*[6] test. *Gregg*, 295 Va. at 298.

Both parties argue, for different reasons, that we should find in their favor based on the plain language of the statute. Assuming without deciding that the language of Code § 18.2-53.1 is subject to multiple interpretations and therefore ambiguous, we proceed to the *Blockburger*

---

[6] *Blockburger v. United States*, 284 U.S. 299 (1932).

analysis. *See Baker v. Commonwealth*, 284 Va. 572, 576 (2012) ("A statute is considered ambiguous 'if the text can be understood in more than one way or refers to two or more things simultaneously or when the language is difficult to comprehend, is of doubtful import, or lacks clearness or definiteness.'" (quoting *Boynton v. Kilgore*, 271 Va. 220, 227 (2006))).

The *Blockburger* test "asks whether each statutory offense requires proof of a fact that the other does not." *Gregg*, 295 Va. at 298. "In applying the *Blockburger* test, we look at the offenses charged in the abstract, without referring to the particular facts of the case under review." *Coleman v. Commonwealth*, 261 Va. 196, 200 (2001).

Code § 18.2-53 makes it a Class 6 felony for any person to "unlawfully shoot, stab, cut or wound another person" in the commission or attempted commission of a felony. Code § 18.2-53.1, on the other hand, makes it unlawful for an assailant to "use or attempt to use any . . . firearm or display such weapon in a threatening manner while committing or attempting to commit" one of the felony offenses enumerated in the statute.

Viewing the elements of each statute in the abstract, both require proof of an element that the other does not. Code § 18.2-53 requires proof that the assailant has shot, "stab[bed], cut or wound[ed] *another person*" in the commission or attempted commission of the predicate felony. Code § 18.2-53 (emphasis added). In contrast, Code § 18.2-53.1 requires proof "that the accused actually had a firearm in his possession and that he used or attempted to use the firearm or displayed the firearm in a threatening manner while committing or attempting to commit . . . one of the . . . specified felonies." *Yarborough v. Commonwealth*, 247 Va. 215, 218 (1994).

The conduct punishable under Code § 18.2-53 necessarily requires that the weapon or bullet come into physical contact with another person. Such showing is not required for a violation of Code § 18.2-53.1. In other words, one could be convicted under Code § 18.2-53.1 for brandishing a firearm or shooting the firearm into the air while committing or attempting to

commit one of the enumerated felonies, but such conduct alone is insufficient to amount to a violation of Code § 18.2-53.

And Code § 18.2-53.1 requires proof that the defendant actually possessed and used, attempted to use, or displayed a firearm, but an individual does not necessarily need to use a firearm to violate Code § 18.2-53. One could be convicted under § 18.2-53 for stabbing another in the commission or attempted commission of a felony, but that conduct does not result in a violation of § 18.2-53.1. Because Code § 18.2-53 and Code § 18.2-53.1 each require proof of an element that the other does not, we find that conviction under both statutes in a single-trial setting does not violate the principles of double jeopardy.

III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

*Affirmed.*